United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 16, 2007**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————

No. 06-60006

———————

DYNASTEEL CORPORATION,

Petitioner-Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner,

———————————————————————————

Petition for Review of an Order of the
National Labor Relations Board

———————————————————————————

Before SMITH, BENAVIDES, and PRADO, Circuit Judges.

BENAVIDES, Circuit Judge:

An administrative law judge (ALJ) found that Dynasteel Corporation engaged in a number of unfair labor practices in violation of the National Labor Relations Act (NLRA). 29 U.S.C. §§ 151-69. The unfair practices arose out of Dynasteel's discrimination against employees and prospective employees affiliated with labor unions. The National Labor Relations Board (NLRB) adopted a substantial majority of the ALJ's findings, issued a cease and desist order, and instructed Dynasteel to undertake

several affirmative remedies. The NLRB now seeks to enforce its order.

Dynasteel challenges the NLRB's factual findings. Its arguments amount to little more than reasserting, before this Court, that its witnesses should have been credited over union witnesses. Finding that substantial evidence supports all of the NLRB's findings, we DENY Dynasteel's petition for review and GRANT the NLRB's request to enforce its order.

## I. NLRB'S FACTUAL FINDINGS

Dynasteel is a steel manufacturer with several plants. The NLRB found that unfair labor practices occurred at facilities in Iuka, Mississippi and Millington, Tennessee. The Iuka activity involved illegal threats and discipline of Dynasteel employees, while the Millington activity involved discrimination against job applicants.

## A. Illegal Threats, Discipline and Discharge in Iuka

In July 2001, Dynasteel altered employee benefits and required workers to purchase some of their own equipment. Employees found this to be an unwelcome development, and discussed forming a union. Eddy Goss and Dee Vaughn, the only two permanent employees in the maintenance department, spearheaded the effort.

When local supervisors learned that employees were possibly forming a union, they responded with hostility. The Iuka plant manager, Mark Jones, told Goss that Dynasteel would "shut the doors

2

and fire everybody before [it] let a Union come in." In July, shop foreman Glen Adcock told a group of employees virtually the same thing. In August, Jones again told Goss in front of co-workers that there "wouldn't be no union," and supervisor Bill Sanders subsequently put his arm around Goss and told him that if a union started, "you'll be the first one fired." There were several similar incidents.

In mid- to late-September, Goss and Vaughn contacted the Steelworkers and Boilermakers unions. Following the unions' advice, the pair contacted 80 to 90 percent of the Iuka plant employees and collected names of those interested in forming a union. On the morning of October 3, foreman Adcock asked Goss whether the workers were starting a union, and he replied "probably so." Adcock then indicated that he would have to get Goss involved in management so he could not be involved with the union.

He then pointed to a number of tools left out overnight and a work truck with its windows down, and instructed Goss to fill out disciplinary forms for Vaughn and a temporary maintenance employee, Tim Barnes. Goss objected to filling out the disciplinary forms, but eventually did as instructed. Goss told Vaughn and Barnes that he was forced to write them up and not to worry about it. Adcock then called Vaughn and Barnes to his office and issued their disciplinary forms. By all accounts, this was the first time Goss administered any type of punishment.

Later that same day, Goss was called into manager Jones's

3

office and terminated. Jones said it was not his decision and that the company's general counsel, Jack Melvin, told him to fire Goss. Goss called Jones again the next day and tape recorded the conversation, where Jones once again claimed he fired Goss at the direction of Melvin. While admitting to these statements, Jones claimed at the administrative hearing that Goss was fired for poor job performance and for leaving work equipment out unsecured overnight.

The following week Vaughn organized approximately 25 employees, including Goss, for a lunchtime union meeting at a nearby diner. Vaughn drove a company truck along with two other employees to the meeting. During the meeting, supervisor Sanders walked into the diner and looked around without purchasing anything while Jones waited for him in a truck outside. When Vaughn returned from the meeting, Adcock called him into an office and terminated him, supposedly for taking a company truck off the premises. While Dynasteel's handbook does provide that employees are forbidden from taking company trucks off the premises without permission, several employees testified that the rule was regularly disregarded without consequence.

In mid-October, after their terminations, Goss and Vaughn returned to the plant wearing union buttons and were greeted in a reception area by secretary Glenda Basham. In a tape-recorded conversation, Basham indicated that they would not be rehired while wearing union buttons and reiterated that the company did not want

4

a union. General Counsel Melvin then emerged and asked them to leave the property. The NLRB did not fault Dynasteel for Basham's statements as she was not a supervisor.[1]

## B. Failure to Hire or Consider for Hire in Millington

In early November, 2001, union organizer Barry Edwards saw a Dynasteel advertisement seeking welders and fitters in a Memphis newspaper. On November 5, Edwards called Dynasteel and discussed the openings with receptionist Rhonda Duffin. He asked if he needed to turn in an application and she told him a resumé would suffice. Edwards then contacted two unemployed union members, Ron Fuqua and Jeff Pearson, to apply for the openings with him. Each of them had significant welding experience, ranging from five to thirty-four years. Edwards dropped off the three resumés—with each identifying himself as a union organizer—to Dynasteel's president, Harold Trusty, on November 5. Trusty indicated it was unnecessary for them to fill out applications.[2]

Between November 5 and 16, Dynasteel hired six welders, but none of the three union applicants were contacted. None of the six hired welders had more than five years of experience, and two of

---

[1] The ALJ did fault Dynasteel for Basham's remarks because Melvin, a supervisor, failed to disavow her statements. The NLRB did not adopt the ALJ's finding on that count, since it was not clear that Melvin ever heard Basham's statement.

[2] Dynasteel uses the lack of applications as a justification for failing to hire the union organizers. It also repeatedly points out that none of the applicants passed a welding test, although the company never attempted to administer welding tests for any of them.

5

them did not have applications in the record.

On December 5, union member Tony Churchill attempted to apply for a position at the Memphis plant. He arrived wearing a union shirt. General Counsel Melvin, without asking what position Churchill was seeking, told him that the company was not hiring during the month of December. He did not give Churchill the opportunity to fill out an application or take a welding test. The company hired three laborers later that month.

## II.  STANDARD OF REVIEW

Dynasteel's arguments amount to little more than complaints that its witnesses should have been credited over union witnesses. We do not make a habit of second guessing such credibility determinations. This Court will uphold the NLRB's fact findings so long as they are "supported by substantial evidence on the record considered as a whole." *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 927 (5th Cir. 1993).

Where, as here, there are two materially conflicting versions of the events requiring that one story be credited over the other, the ALJ's credibility determination must be deferred to unless it (1) is unreasonable, (2) contradicts other findings, (3) is based upon inadequate reasons or no reason, or (4) is not justified by the ALJ. *Asarco, Inc., v. NLRB*, 86 F.3d 1401, 1406 (5th Cir. 1996).

## III.  SUBSTANTIAL EVIDENCE SUPPORTS ALL THE NLRB'S FINDINGS

NLRA Section 8(a)(1) makes it unlawful to "interfere with, restrain, or coerce employees in the exercise of rights" to collective organization.  29 U.S.C. § 158(a)(1).  Section 8(a)(3) makes it unlawful for employers, "in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization."  *Id.* at § 158(a)(3).  The NLRB found numerous violations of these sections.

The violations are based on four findings that Dynasteel now disputes: (1) Goss was not a supervisor, and therefore was an employee covered by the NLRA, (2) Goss and Vaughn were terminated due to their union activities, (3) Edwards, Pearson, Fuqua and Churchill were not hired or considered for hire due to their union activities, and (4) Dynasteel threatened, interrogated and spied on employees to deter the formation of a union.  Generally, Dynasteel argues that its witnesses were more believable and should have been credited over union witnesses, but that is precisely the type of judgment we leave to the ALJ.  Substantial evidence supports each of the disputed findings.

A.  Goss was not a Supervisor

The NLRA generally only protects employees, thereby excluding supervisors from its protections.  *Id.* at §§ 151, 152(3).  The NLRA defines a supervisor as:

> any individual having authority, in the interest of the
> employer, to hire, transfer, suspend, lay off, recall,
> promote, discharge, assign, reward or discipline other
> employees, or responsibility to direct them, or to adjust

7

> their grievances, or effectively to recommend such action, if . . . such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Id.* at § 152(11).

The burden of demonstrating Goss's supervisory status rests with Dynasteel as the party asserting it. "It falls within the Board's discretion to determine, within reason, what scope of discretion qualifies." *NLRB v. Kent. River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001). Dynasteel argues that Goss was a supervisor on three bases: Goss (1) disciplined Vaughn and Barnes on one occasion, (2) effectively recommended Vaughn's hire, and (3) assigned work and directed employees.

The NLRB's finding that Goss was not a supervisor is supported by substantial evidence and was within its scope of discretion. First, it is uncontested that the only time Goss disciplined anybody was hours before he was fired, when he was instructed to write disciplinary memos for employees Vaughn and Barnes. The ALJ credited Goss's and Vaughn's testimony that this was a subterfuge to make it appear that Goss was a supervisor, and that he was unlawfully forced to write the disciplinary memos.

As to the second point, even if Goss recommended Vaughn for hire—an issue that is refuted by Goss—there is nevertheless no evidence in the record that his recommendation was of any decisive import.

Third, Barnes testified with regard to Goss that, "I guess he

8

was supervisor, but I don't know."  Goss told him to do "little-bitty particular things" like sweeping the floor and making welding leads.  Such instructions should be considered "routine or clerical in nature" under the NLRA, and it is within the Board's discretion to decide whether those activities made Goss a supervisor.  *Kent. River Cmty. Care, Inc.*, 532 U.S. at 713.

Dynasteel's repeated reliance on the fact that Goss was "the highest paid employee in his department" is almost comical when reminded that the department had only two permanent employees, Goss and Vaughn.  Goss had been employed by Dynasteel approximately six months longer than Vaughn, thereby explaining his marginal pay advantage.

We conclude that the NLRB was well within its discretion when it found on these facts that Goss was not a supervisor.

B.  Goss and Vaughn Were Discharged due to Union Animus

The NLRB found that Goss and Vaughn were discharged in retaliation for attempting to start a union.  The ALJ credited Goss's and Vaughn's testimony, finding it to be "clear, detailed, and specific" and supported by the evidence.  Specifically, Goss was fired the day he filled out his first ever disciplinary form and was told repeatedly that he would be fired if he started a union.  Vaughn was fired the day he was seen organizing a union meeting.  Their testimony and the remarkable timing of their terminations provide substantial evidence that they were fired due

9

to union animus.

Dynasteel presented witnesses that claimed Goss was fired for leaving tools unsecured and that Vaughn was fired for taking a company truck to a lunch meeting. But the existence of divergent testimony is not enough to make the administrative findings unreasonable or unsupported. Once again, we are faced with contradictory testimony, and we defer to the NLRB's findings so long as they are reasonable and supported. There is no requirement that they be undisputed. The discredited and highly suspect[3] testimony of supervisors does not compel a finding that Goss and Vaughn would have been fired absent the protected activity.

## C. Applicants Not Hired or Considered for Hire due to Union Animus

There was substantial evidence to support the finding that applicants Edwards, Pearson, Fuqua and Churchill were not hired or considered for hire due to union animus. On Friday, November 2, Dynasteel ran an advertisement seeking welders and fitters for its Memphis plant. The following Monday, November 5, union representative Edwards submitted resumés for himself, Pearson and

---

[3] Dynasteel's explanation of Sanders's activity when he spied on Vaughn in the diner is dubious at best. At one point, it claims that Sanders went inside the diner to assess who took the company truck, despite the fact that upon seeing twenty-five employees in the diner Sanders never asked who took it. (Blue Br. at 55). At another point, Sanders claims that he was simply trying to get a plate of food, making it peculiar that he left so quickly without actually getting food. *Id.* In either case, this testimony was discredited by the ALJ, and we do not disturb that finding.

Fuqua, with each identifying himself as a union member. Two welders were hired that very day, one the next, and one each on Nov. 11th, 13th, 14th, and 16th. The most experienced person hired had five years of welding experience, the same amount as the least experienced of the three union applicants. This provided substantial evidence that (1) the employer was hiring, (2) the applicants were adequately qualified, and (3) union animus contributed to the decision not to hire the applicants.

Dynasteel denies that its decision was based on union animus, and claims that the applicants were not hired because they did not complete an application or welding test.[4] But Edwards testified that both a receptionist and Dynasteel's president informed him that a resumé was all that was needed to apply. While Edwards's testimony is enough to constitute substantial evidence, this is further supported by the fact that two hired applicants had no application on file.

As for Churchill, who attempted to apply on December 5 wearing a union t-shirt, General Counsel Melvin told him that the company

---

[4] Dynasteel also contends that it hires using a reverse chronological method, giving first consideration to those candidates that apply latest (closer to the time of hire). Dynasteel's account of its hiring policy is suspect. Dynasteel argues that it hired the most recent applicant every time a job position opened up, and during the several days that the union applicants were the most recent applicants, no job positions were open. But once somebody else applied, on November 11, there was suddenly a job opening and that person became the most recent applicant. It is a whimsical policy that could insulate any company's hiring choices, but the ALJ was not obligated to believe such a far-fetched account.

11

was not hiring during December and would not accept any application materials from him. Melvin did not ask Churchill about his experience or what position he was applying for. Dynasteel hired three laborers in the weeks after Churchill attempted to apply.

Dynasteel argues that its activities were consistent with a general plan not to hire welders or fitters during December, and points out that it did not hire any welders after Churchill attempted to apply. But its theory is drastically undercut by the fact that Melvin did not ask what type of job Churchill was applying for. For all Melvin knew, Churchill wanted to be a laborer, and Dynasteel hired three laborers in subsequent weeks. The best account of what happened, and an account that is at least supported by substantial evidence, is that Churchill was turned away because of his union affiliation as signified by his shirt.[5]

D. Illegal Threats, Surveillance and Interrogations

Finally, the NLRB adopted numerous findings that Dynasteel threatened, interrogated and spied on its employees attempting to form a union. The numerous threats include: (1) Adcock telling employees that Dynasteel would shut down before it let a union in, (2) Jones telling Goss that "there wouldn't be no Union come in

_____

[5] At oral argument, Dynasteel's counsel attempted to undercut the ALJ's reasoning that Churchill was turned away because he was wearing a union t-shirt. Counsel argued that, "if I were wearing a Drew Brees jersey, you wouldn't assume that I'm Drew Brees." But, as opposing counsel pointed out, we would probably assume he was a Drew Brees fan, much like Melvin would have assumed that Churchill was a union supporter.

12

here," and (3) Sanders telling Goss he would be the first one fired if a union came in. Interrogations include (1) Adcock asking Goss if they were starting a union and, post-termination, (2) Jones asking Goss "why do they want a union?" The only incident of surveillance occurred when Jones and Sanders arrived at a company diner during a union meeting and Sanders stepped in, looked around, and left just minutes before Vaughn was fired.

Dynasteel's only complaint with regard to these findings is that the ALJ credited the wrong witnesses. Once again, that is a judgment we generally leave to the ALJ and NLRB, and will defer to their findings so long as they are reasonable and supported by substantial evidence. Dynasteel never shows how the findings were unreasonable or unsupported, so we defer to the NLRB on the matter.

## IV. CONCLUSION

Because all the NLRB's findings are supported by substantial evidence, Dynasteel's petition for review is DENIED, and the NLRB's request to enforce its order is GRANTED in full.

13