# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fif h Circuit

**FILED**

September 15, 2017

Lyle W. Cayce
Clerk

————

No. 16-60333

————

ADAMS AND ASSOCIATES, INCORPORATED; MCCONNELL, JONES, LANIER & MURPHY, L.L.P.,

Petitioners Cross-Respondents

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent Cross-Petitioner

————

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

————

Before HIGGINBOTHAM, GRAVES, and HIGGINSON, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

Adams and Associates, Inc. ("Adams") and McConnell, Jones, Lanier & Murphy LLP ("MJLM") petition for review of an order of the National Labor Relations Board, holding them liable for unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* Adams and MJLM operate a Job Corps Youth Training Center in Sacramento, California, under a contract with the Department of Labor. The allegations in this case arose from Petitioners' successorship to the former contractor, Horizons Youth Services, LLC ("Horizons"). During the period in which it operated the Center, Horizons had a collective-bargaining agreement with Sacramento Jobs Corps

No. 16-60333

Federation of Teachers, AFT Local 4986, American Federation of Teachers (the "Union"). The Board's order found that Adams violated Sections 8(a)(3) and (1) of the Act by discriminatorily refusing to hire five incumbent employees in order to avoid an obligation to bargain with the Union; and violated Sections 8(a)(5) and (1) by unilaterally imposing initial terms and conditions of employment on the unit employees and banning Union president Genesther Taylor from the Center. The Board further found that MJLM and Adams are joint employers and are jointly and severally liable for the aforementioned violations. The Board cross-petitions for enforcement of its order. For the reasons that follow, we deny the petition for review and grant the Board's cross-petition for enforcement of the order.

## I.   BACKGROUND

MJLM and Adams jointly bid for a contract with the Department of Labor ("DOL") to operate the Job Corps Center in Sacramento (the "Sacramento Center" or the "Center"). The Job Corps program administered by the DOL provides academic and vocational training to economically disadvantaged youth, ages sixteen to twenty-four, at residential centers throughout the United States. Both companies have contracts to operate various Job Corps centers across the country. In early February 2014, the DOL awarded the primary contract to MJLM to operate the Center with Adams as its subcontractor for residential, wellness, recreation, counseling, and career services. MJLM has "overall responsibility for management of the Center" and "directly handles education and training, maintenance, finance, and administration." Horizons had been operating the Center since 2009. Its collective-bargaining agreement ("CBA") with the Union covered all bargaining unit employees, which included "[a]ll full-time Residential Advisors (RA), Non-Residential Advisors, and Day Residential Advisors employed at the [Center]." Horizons employed 26 bargaining unit RAs, who oversaw the students residing in the Center's

2

dormitories. The most recent agreement between Horizons and the Union was effective by its terms until June 2013, but had been extended to March 9, 2014.

***Transition Process Begins***

In early February 2014, MJLM and Adams opened a shared transition office in the Sacramento Center. Both Adams and MJLM personnel participated in the transition. From Adams, the transition management team consisted of Executive Director Jimmy Gagnon, Executive Director of Human Resources Valerie Weldon, and Deputy Center Director Kelly McGillis; from MJLM, Partner Sharon Murphy, HR Director Joyce Barrett, and Center Director Erica Evans participated. Adams' CEO Roy Adams ("Roy") and Vice President for Human Resources and General Counsel Tiffinay Pagni provided additional support from Adams' headquarters. Evans had been the Horizons Center Director and was hired by MJLM to fill that same position. McGillis directly reported to Evans.

On February 11, the Union notified MJLM that it was the exclusive collective-bargaining representative of the unit employees and requested information concerning the hiring process. On February 13, Adams responded to the Union and stated that it would be responsible for hiring and employment of the Center's RAs. That same day, Gagnon met with a group of Horizons RAs to announce the transition and advise them about the hiring process. Former Horizons RA and Union President Taylor attended the meeting. She later testified that Gagnon told the RAs that they had been "doing a really good job" and that "aside from disciplinary issues, he was 99 percent sure that [they] would all have a job" after the transition. Gagnon also stated that Adams planned to reduce the number of RAs from twenty-six to fifteen, but would also hire five people in the new position of Residential Coordinator ("RC"). RCs would have roughly the same job duties as RAs, but would also fill in for dormitory supervisors and shift managers when necessary. The Horizons employees were

then invited to apply for up to two available positions and given twenty-four hours to return completed applications. They were permitted to review job descriptions at the meeting, but Taylor's request for copies of the job descriptions was denied. Fourteen incumbent RAs applied for the fifteen available RA positions.

The following day, the Union demanded that Adams recognize and bargain with it as the representative of the RAs. Adams did not respond. Also on that day, Taylor visited the transition office to submit her employment application. She again requested copies of the job descriptions and asked Gagnon additional questions about the transition. Gagnon said that he was unable to provide copies or answer any of her questions and directed her to contact Pagni. Taylor also asked McGillis for a blank employment application for a Horizons RA on medical leave. McGillis referred Taylor to Weldon.

### The Hiring Process

The transition period was put on hold for two weeks during a contract appeal and resumed in late February. Although Adams led the hiring process, both Adams and MJLM personnel interviewed applicants and made hiring recommendations. Gagnon made the final hiring decisions. In filling RA positions, Adams was required to follow Executive Order 13495 Non-Displacement of Qualified Workers under Service Contracts ("EO 13495"). EO 13495 incorporated a right of first refusal for displaced employees and required successor contractors to offer employment to all "qualified" incumbent employees of the predecessor contractor. EO 13495 also required the successor to issue employment offers no later than 10 days prior to the commencement of operations. To comply with EO 13495, Adams, through Pagni, created a "Justification for Disqualification of Potential Employment" form ("Disqualification Form"), which the transition team used to document the reasons for not hiring any incumbent applicants.

No. 16-60333

It is Adams's practice in such transitions to hire management personnel first, in part so that they can provide input on the performance of incumbent employees. A new contractor is typically not given access to the former contractor's personnel records and that was the case at the Sacramento Center. Horizons, however, did provide a list of all its current employees, including their job titles and hire and seniority dates ("Horizons List I").

After Adams hired former Horizons dorm manager, Lee Bowman, McGillis shared Horizons List I with Bowman and sought her feedback on RA applicants.[1] Bowman placed an asterisk next to the names of incumbent RAs she recommended for hire and a dot next to those whom she did not recommend hiring. McGillis also annotated the list with Bowman's comments. Horizons List I was later copied with Bowman's dots and asterisks, but not McGillis' annotations, into another list ("Horizons List II"). McGillis testified that the purpose of duplicating the list was to eliminate a comment regarding an employee on medical leave, out of concern that it violated the individual's privacy rights under the Health Insurance Portability and Accountability Act. Gagnon rewrote McGillis' other annotations into Horizons List II, which McGillis signed with the original date. Horizons List I no longer existed at the time of trial.

Based on Bowman's comments, McGillis completed Disqualification Forms for five incumbent applicants, whom Adams did not hire: Genesther Taylor, Shannon Cousins-Kamara, Andre Lang, Macord Nguyen, and Azaria Ting. According to McGillis, the forms did not automatically disqualify the applicant, but were simply one piece of information Adams considered in hiring. Adams completed Disqualification Forms for nine of the fourteen incumbent

---

[1] Gagnon and Murphy conducted the same process with other former Horizons managers hired during the transition.

RA applicants. The transition team nonetheless interviewed all fourteen. For each applicant, interviewers filled out an Interview Evaluation Form and submitted it to Gagnon and Weldon. Applicants were rated in nine categories on a scale of one to four, with one being excellent and four being unsatisfactory.

McGillis interviewed Taylor on February 28 and recommended that she not be hired. McGillis admitted that sometime after the interview, she amended Taylor's Interview Evaluation Form, downgrading several of Taylor's interview scores from 2 (average) to 3 (below average). According to McGillis, she made the changes because she realized after interviewing other applicants that she had scored Taylor "much higher than she deserved."

McGillis also interviewed Cousins-Kamara. McGillis testified that Cousins-Kamara provided a lot of information, including that she had been "awarded a dorm of the month recognition month after month and was employee of the month," which "sounded almost too good to be true." Former RA Andre Lang, however, testified that he had worked with Cousins-Kamara in the Shasta dorm and that all the information Cousins-Kamara related was true. McGillis completed an Interview Evaluation Form for Cousins-Kamara, but after speaking with Bowman, she shredded the initial form and replaced it with a second form recommending against hiring.

By late February or early March, when there were only a few RA positions left to fill, Gagnon and Weldon had a conversation about four RA applicants for whom Disqualification Forms had been completed, but who interviewed well and received good scores: Diane Calahan, Andre Lang, Vincente Moran, and Jill Ostrowski. Weldon testified that she told Gagnon, "We can't not hire these employees . . . just because they are part of the Union." Gagnon decided to extend offers to all four, although later rescinded the offer to Lang after a background check indicated a potential discrepancy in employment dates for a position he held before working at Horizons.

No. 16-60333

Adams ultimately hired nine incumbent RAs for the fifteen available positions. Adams filled the remaining RA positions with non-bargaining unit Horizons substitute RAs and a Horizons custodian. Four of the five substitute RAs had been employed by Horizons for only a few months. Because Adams had hired a majority of former bargaining unit employees, it incurred an obligation to bargain with the Union.

***Post-Hiring Events***

On March 4, after it became clear that Adams had incurred a bargaining obligation, Roy sent an email to hiring committee members, including Pagni, Gagnon, and Weldon, which stated: "Unfortunately, we hired the majority of the union members at Sacramento and we, therefore, must negotiate a Collective Bargaining Agreement and incur other associated union legal costs." The following week, Roy visited the Sacramento Center and pulled Weldon aside to ask her what happened. She related her conversation with Gagnon regarding the four incumbent RAs whose interviewers had recommended hiring. Weldon testified that Roy "was very angry and he said that we screwed up. The Union was now involved and he was not happy."

In late March, Weldon was sent back to Sacramento to gather additional information about various non-hires because Pagni felt that the documentation of their disqualification may not have been sufficient to comply with EO 13495. While Weldon was there, she received an email from Pagni with instructions for gathering supplemental information. Pagni wrote that the information provided by Evans was not "really helpful" and that she "also mentioned the union in her comments. Union involvement was not questioned or used as a DQ'ing factor for these individuals and cannot be used in these further supporting documents. We need to take any mention of union out."

On March 22, Roy sent a "Memorandum for Personnel Files of Tiffinay Pagni and Valerie Weldon" to Pagni. The memorandum, titled "Significant

7

Performance Concerns," stated that Roy was "very concerned about the performance of Executive level Human Resource staff with oversight responsibility for the transition at the Sacramento Job Corps Center." Among the priorities for the transition that were not achieved, he listed "[w]ithin compliance guidelines, avoid union recognition" and "[p]rotect the company from expensive union-related costs." The memorandum concluded:

> Despite repeated direction, guidelines, forms, discussions, HR staff experience, qualifications, 10 years of union avoidance responsibility and, quite frankly, common sense, the company HR department failed to achieve minimum performance at the Sacramento transition.

On March 27, Pagni sent an email to Weldon, forwarding Roy's Memorandum and providing additional performance feedback. Pagni stated that "[w]e were . . . expected to assure disqualification information was well-documented and defensible and to avoid union recognition in order to protect the company from significant union related expenses and challenges. Neither of these things happened[.]" Pagni further commented that "[i]n preparing a recent summary of individuals who applied versus those who were hired, there are ample incumbent Sub RA's on the list. These incumbent employees could have been used to fill the RA positions without acknowledging the union. Roy raised this issue repeatedly." On April 25, Pagni presented Weldon with a Final Written Warning, copying Roy and Adams President of Operations Susan Larson. One of the performance concerns raised was that Weldon had failed to conduct "Union Avoidance activities pursuant to policy, including training[.]"

### *Commencement of Operations and Changes to Employment Terms and Conditions*

Petitioners began operating the Center on March 11. Staff were employed under new terms and conditions. Specifically, Petitioners had ceased to give effect to the CBA's progressive discipline, just cause, and grievance provisions; implemented at-will employment, new disciplinary policies and procedures,

and a mandatory arbitration policy for employment-related disputes; modified the terms of the existing probationary period; replaced existing health benefits with a new plan; and changed some RAs' schedules from fixed shifts to rotating shifts. Adams also assigned RA work to employees in the new RC position, which was not part of the bargaining unit. Adams notified new hires of these changes in their offer letters and employment agreements.

Between April and September, Adams discharged four RAs: Sheila Broadnax, Rolando Aspiras, Bienvenido Viloria, and Vincente Moran. They were discharged without recourse to the CBA's progressive discipline process. Adams did not notify the Union about the discharges.

*Union Negotiations*

On March 11, the Union renewed its demand for recognition and bargaining. On March 28, Adams recognized the Union as the bargaining representative for RAs and agreed to bargain. Adams, however, refused to allow Taylor access to the Center to attend bargaining sessions. As a result, the first three bargaining sessions were held at the Union's office. After the third session, Adams agreed to allow Taylor access to the Center. The fourth session took place there.

*Procedural History*

The Union filed charges with the NLRB alleging that Adams had committed multiple violations of the NLRA. Thereafter, the Board's General Counsel ("General Counsel") issued a consolidated, amended complaint against Adams and MJLM as joint employers. The complaint alleged that Adams violated the Act by refusing to hire Cousins-Kamara, Lang, Nguyen, Taylor, and Ting in order to avoid a bargaining obligation, and additionally refused to hire Taylor because of her union activity. Further, the complaint alleged that Adams impermissibly made unilateral changes in the terms and conditions of employment; discharged Broadnax, Aspiras, Viloria, and Moran without prior

notice to the Union or an opportunity to bargain; and refused to bargain with the Union in good faith by barring Taylor from the Center and by refusing to meet at reasonable times and places.

The case was tried before an Administrative Law Judge ("ALJ") over seven days in early 2015. The ALJ heard testimony from several witnesses and admitted numerous documents in evidence. On June 16, 2015, the ALJ issued a decision agreeing with the General Counsel in almost every respect. She determined, *inter alia*, that a corporate successorship avoidance plan formed the overarching basis for hiring during the transition and that Adams's asserted reasons for not hiring the five incumbent RAs were "patently pretextual." The ALJ, however, rejected the General Counsel's argument that Adams was a "perfectly clear" successor as of February 13, 2014, the date of Gagnon's first meeting with the RAs. Nevertheless, the ALJ found that Adams had forfeited its right to unilaterally set initial terms and conditions of employment by unlawfully discriminating against incumbent employees to avoid a bargaining obligation. The ALJ declined to address the General Counsel's alternative theory that Taylor had not been hired due to her union activity, but noted that were she to address it, she would find that Taylor's union activity was part of the basis for Adams's decision not to hire her.

On May 17, 2016, a three-member panel of the Board affirmed the ALJ's decision and adopted the ALJ's findings and recommendations with two modifications. Unlike the ALJ, the Board determined that Adams was a "perfectly clear" successor as of February 13. The Board also held that Taylor had been denied employment on account of her Union activities, as well as to avoid a bargaining obligation.

As a remedy for these violations, the Board has ordered Adams and MJLM to offer instatement to the five incumbent RAs who were not hired (Cousins-Kamara, Nguyen, Taylor, Lang, and Ting), offer reinstatement to the

four RAs later discharged (Broadnax, Viloria, Aspiras, and Moran), and make all the discriminatees whole. Further, upon request from the Union, Adams and MJLM must rescind the unilateral changes to employment terms and conditions and restore the status quo ante until the parties reach a new collective-bargaining agreement or lawful impasse. To remedy the unilateral transfer of bargaining unit work from the RA to RC position, the Board ordered Petitioners to recognize the Union as the exclusive collective-bargaining representative of the RCs, and to make the RCs whole for any losses.

On May 27, 2016, Adams and MJLM jointly petitioned for review of the Board's order. The Union has intervened and filed a brief in support of the Board. Meanwhile, Adams moved for reconsideration, which the Board denied on July 29, 2016. On November 11, 2016, the Board cross-petitioned for enforcement of its order.

## II.    STANDARD OF REVIEW

"We review the Board's factual findings under a substantial evidence standard and its legal conclusions de novo." *El Paso Elec. Co. v. N.L.R.B.*, 681 F.3d 651, 656 (5th Cir. 2012). But we defer to the legal conclusions of the Board "if they have a reasonable basis in the law and are not inconsistent with the Act." *Valmont Indus., Inc. v. N.L.R.B.*, 244 F.3d 454, 464 (5th Cir. 2001). "Substantial evidence is 'such relevant evidence as a reasonable mind would accept to support a conclusion.'" *J. Vallery Elec., Inc. v. N.L.R.B.*, 337 F.3d 446, 450 (5th Cir. 2003) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951)). "It is more than a mere scintilla, and less than a preponderance." *UNF W., Inc. v. N.L.R.B.*, 844 F.3d 451, 456 (5th Cir. 2016) (quoting *El Paso Elec.*, 681 F.3d at 656). "Although the reviewing court is 'obligated to consider evidence that detracts from the Board's finding,' the ALJ's decision stands 'if a reasonable person could have found what the ALJ found, even if the appellate court might have reached a different conclusion had the matter been presented

No. 16-60333

to it in the first instance.'" *Id.* at 456–57 (citations omitted). The ALJ's credibility determinations are binding unless: "(1) the credibility choice is unreasonable, (2) the choice contradicts other findings, (3) the choice is based upon inadequate reasons or no reason, or (4) the ALJ failed to justify [her] choice." *Id.* at 457 (quoting *Asarco, Inc. v. N.L.R.B.*, 86 F.3d 1401, 1406 (5th Cir. 1996)).

## III.  DISCUSSION

Adams argues that the Board's findings are not supported by substantial evidence. Specifically, Adams argues the Board erred by (1) concluding there was substantial evidence of antiunion animus during the transition period; (2) concluding that Adams was a "perfectly clear" successor to Horizons' CBA with the Union; (3) ordering as a remedy that Adams recognize the Union as the bargaining representative of employees in the RC position; (4) concluding Adams violated the Act by enforcing its site access rule against Taylor; and (5) concluding that Adams and MJLM are joint employers under the NLRB. MJLM contests only the joint employer finding. We address each argument in turn.

### A. *The Record Contains Substantial Evidence of Antiunion Animus*

A "successor is under no obligation to hire the employees of its predecessor," but this prerogative is "subject, of course, to the restriction that it not discriminate against union employees in its hiring." *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 40 (1987). "[T]o establish a violation of Section 8(a)(3) and (1) in cases where a refusal to hire is alleged in a successorship context, the General Counsel has the burden to prove that the employer failed to hire employees of its predecessor and was motivated by antiunion animus."[2] *Planned Bldg. Servs., Inc.*, 347 N.L.R.B. 670, 673 (2006),

---

[2] Sections 8(a)(1) and (3) provide in relevant part:

(a) It shall be an unfair labor practice for an employer–

12

*overruled on other grounds by Pressroom Cleaners & Serv. Emps. Int'l Union, Local 32BJ*, 361 N.L.R.B. No. 57 (Sept. 30, 2014). Once this is shown, "the burden then shifts to the employer to prove that it would not have hired the predecessor's employees even in the absence of its unlawful motive." *Id.* at 674. A violation can be established by factors such as:

> substantial evidence of union animus; lack of a convincing rationale for refusal to hire the predecessor's employees; inconsistent hiring practices or overt acts or conduct evidencing a discriminatory motive; and evidence supporting a reasonable inference that the new owner conducted its staffing in a manner precluding the predecessor's employees from being hired as a majority of the new owner's overall work force to avoid the Board's successorship doctrine.

*U.S. Marine Corp.*, 293 N.L.R.B. 669, 670 (1989), *enforced sub nom. U.S. Marine Corp. v. N.L.R.B.*, 944 F.2d 1305 (7th Cir. 1991) (en banc). Antiunion animus need not be the sole motivating factor for the employer's refusal to hire, only "a substantial or motivating factor in the adverse action." *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983), *abrogated on other grounds by Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267 (1994). "Motive is a factual matter . . . and the Board reasonably may infer motive from the circumstances surrounding the employer's actions, as well as from direct evidence." *Asarco, Inc.*, 86 F.3d at 1408.

Adams argues that the Board's finding of antiunion animus in the transition hiring process is infirm because it relied solely on "[s]uspicion,

---

> (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title; . . .

> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

29 U.S.C. § 158(a). "[A] violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)." *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693, 698 n.4 (1983).

No. 16-60333

conjecture, or theoretical speculation," *N.L.R.B. v. Mini-Togs, Inc.*, 980 F.2d 1027, 1032 (5th Cir. 1993). We disagree.

First, Roy's own statements and actions evince an intent to avoid bargaining with the Union. Adams does not deny that Roy explicitly voiced displeasure at the transition team's failure to avoid Union recognition.[3] Adams asserts, however, that these statements merely voice a preference for avoiding Union recognition and do not support the conclusion that Adams acted consistently with that preference. It analogizes to the comments at issue in *Brown & Root, Inc. v. N.L.R.B.*, 333 F.3d 628 (5th Cir. 2003). That case also arose in the successorship context. There, we determined that a project manager's statement during a confrontational meeting with incumbent employees that "Brown & Root was non-union and would remain that way" was insufficient, without more, to support a finding that Brown & Root's hiring decisions were in fact motivated by antiunion animus. *Id.* at 638–39. Adams's reliance on *Brown & Root* is misplaced. Roy's statements did not merely express a personal preference. They indicate that the CEO of Adams himself intended for the company to avoid recognizing the Union. Furthermore, this corporate strategy was so important that Roy seriously disciplined senior officers of the company for failing to carry it out.

---

[3] These statements appeared in an email that Roy wrote to Gagnon, Weldon, Pagni, and others, shortly after it became clear that Adams had incurred an obligation to bargain with the Union. Adams argues that the Board erroneously relied on this email and other communications involving Pagni and/or Weldon, because they constituted inadmissible evidence protected by the attorney-client privilege. Both Pagni and Weldon are licensed attorneys and Pagni has a dual role as Adams's senior HR executive and General Counsel. Adams raised this same objection to the ALJ, who conducted an *in camera* review of the documents and determined that they pertained principally to human resources or labor relations, and not to legal advice. Therefore, the ALJ concluded they were not privileged communications. Based on our independent review of these communications, we agree. *See EEOC v. BDO USA, L.L.P.*, 856 F.3d 356, 364 (5th Cir. 2017) ("[W]here business and legal advice are intertwined, the legal advice must predominate for the communications to be protected." (citation omitted)).

Roy's statements are also not the only ones indicative of a corporate strategy of successorship avoidance. Pagni's emails to Weldon reveal that Adams's top HR executive was well aware of this corporate strategy. And she explicitly discussed one method of carrying it out—selecting non-bargaining unit substitute RAs to fill RA positions, a tactic that Pagni said "Roy raised . . . repeatedly." Weldon also testified that it was "widely known" that Roy wanted the company to avoid Union recognition. In addition, the record demonstrates that the transition team sanitized records to remove references to the Union, altered records, and shredded documents pertaining to the five bargaining unit RAs who were not hired. These acts support the inference of a coordinated effort to avoid hiring unit employees and an attempt to paper over that objective.

Adams protests that members of the transition team denied that they were under direct orders not to hire bargaining unit employees. This, however, is only a challenge to the ALJ's credibility determinations. The ALJ discredited the testimony of Adams's witnesses on a number of points, based on their demeanor and equivocation at the hearing, as well as the "overwhelming evidence" of antiunion animus. These credibility determinations are binding unless unreasonable, contradictory to other findings, or unjustified. *UNF W., Inc.*, 844 F.3d at 456; *El Paso Elec.*, 681 F.3d at 665. The ALJ provided her reasons for each credibility determination and the record as a whole supports them. Adams's argument that it cannot be liable for its union avoidance activities because it ultimately recognized and bargained with the Union is similarly unpersuasive. As the ALJ noted, the fact that Adams's plan to avoid successor status failed does not negate the substantial evidence that it existed. *See Great Lakes Chem. Corp. v. N.L.R.B.*, 967 F.2d 624, 628 (D.C. Cir. 1992) (rejecting the same argument because "the more reasonable inference is that the [e]mployer's discriminatory design ultimately failed, not that it wasn't tried").

Adams also contends that it had non-discriminatory reasons for not hiring the five incumbent RAs. But it offered those same reasons to the ALJ, and she determined that they were "patently pretextual." The ALJ found that Adams struggled to provide meaningful rationales for disqualifying the incumbent bargaining unit candidates and had to send Weldon back for "further after-the-fact evidence," with instructions to sanitize documents by deleting any reference to the Union. While each of these candidates had multiple years of experience on the job, Adams instead hired non-unit Horizons substitute RAs, some with only a few months of experience, and a Horizons custodian.

Furthermore, the ALJ made several credibility determinations in arriving at her conclusions. As discussed above, such determinations require deference except in unusual circumstances. Here, the ALJ provided thorough explanations for her determinations, which are eminently reasonable. For example, McGillis and Gagnon offered several reasons for not extending an offer of employment to Taylor, including her alleged poor performance during the interview and Bowman's comment that she "doesn't get much done." But at trial, McGillis and Taylor offered starkly different versions of the interview. The ALJ found Taylor's testimony to be "straightforward, convincing, and unflinching." By contrast, she found McGillis's testimony to be "laced with examples of shredding, back dating and signing forms to make them look like originals when they were actually manufactured at a later time, [and] writing over interview forms in an attempt to cover up original impressions." McGillis also admitted that she retroactively lowered Taylor's interview scores by adding an extra loop to her "2s" to make them look like "3s." The ALJ found McGillis's proffered explanation, that she realized she had scored Taylor "much higher than she deserved," unconvincing. Furthermore, McGillis's additional explanation that her changed opinion was based on Taylor's "very disruptive" visits to the transition office, during which she was performing her duties as Union president, was itself

16

evidence that Taylor's union activity contributed to McGillis's and others' negative impressions of her.[4] As for Bowman, the ALJ described her testimony as "incredible" and her demeanor "somewhat uncooperative with a pronounced lack of interest in providing truthful testimony."

We have reviewed the ALJ's findings and credibility determinations as to Adams's claimed reasons for refusing offers to Taylor, Cousins-Kamara, Lang, Nguyen, and Ting and we see no reason to disturb them. As discussed above, the ALJ's credibility determinations are binding except in rare instances. *Asarco*, 86 F.3d at 1406; *see also N.L.R.B. v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962) (explaining that the deferential standard of review is appropriate because the "[the ALJ] . . . sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records"). We are satisfied that the ALJ's and the Board's findings as to the Section 8(a)(3) and (1) violations are reasonable and supported by the record as a whole. Accordingly, we affirm them. *See Valmont Indus.*, 244 F.3d at 470.

## B. *Adams's Unilateral Imposition of Initial Terms and Conditions of Employment Violated the Act*

The Board determined that Adams's unilateral changes to mandatory terms and conditions of employment violated Sections 8(a)(5) and (1) of the Act, based on two alternative theories.[5] First, through its unlawful refusal to hire Horizons employees in an effort to avoid bargaining with the Union, Adams

---

[4] Gagnon also testified that he decided not to hire Taylor based, in part, on "[his] interactions with her" and "[his] observations of her interactions" with others. The Board found that it was undisputed that all of Gagnon's interactions with Taylor and all of Taylor's interactions with others that Gagnon observed took place while Taylor was acting in her capacity as Union president. We agree with the Board that the evidence supports the General Counsel's allegation that Adams refused to hire Taylor, in part, because of her union activity and we affirm the Board's finding of a separate Section 8(a)(3) violation on this ground.

[5] Section 8(a)(5) of the Act provides that an employer engages in unfair labor practice by "refus[ing] to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5).

forfeited its right as a successor employer to set initial employment terms. Second, by failing to announce its intent to change employment terms prior to, or simultaneously with, its expressed intent to retain Horizons employees, Adams became a "perfectly clear" successor with an obligation to bargain with the Union. Adams directly challenges only the Board's second theory—that Adams was a "perfectly clear" successor.

Although a successor employer is ordinarily free to set initial terms on which it will hire its predecessor's employees, when a successor evinces a "perfectly clear" intention to retain the predecessor's employees, it must consult with their bargaining representative before fixing its own terms. *N.L.R.B. v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 294–95 (1972); *see also Spruce Up Corp.*, 209 N.L.R.B. 194, 195 (1974) (clarifying that the "perfectly clear" caveat applies where, *inter alia*, successor "has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment"), *enforced sub nom. N.L.R.B. v. Spruce Up Corp.*, 529 F.2d 516 (4th Cir. 1975) (per curiam).

The Board's finding that Adams was a "perfectly clear" successor was based on Gagnon's meeting with the RAs on February 13, in which he told them that they had been "doing a really good job" and that "aside from disciplinary issues, he was 99 percent sure that [they] would all have a job" after the transition. The Board determined that Gagnon's comments during that meeting "manifested an intent to retain the incumbent RAs." Further, it determined that Adams had not clearly announced its intent to establish new employment terms prior to or simultaneously with the February 13 meeting.

Adams does not deny that it is a successor employer. Neither does it dispute the Board's finding that Gagnon's comments at the February 13 meeting created an expectation that Horizons bargaining unit employees would retain their employment after the transition. It contests only the Board's

finding that Adams did not give prospective employees clear notice of its intent to establish new employment conditions. Adams points to various statements Gagnon made during the February 13 meeting, which Adams contends put the RAs on notice that their employment would be under different terms: the reduction in the number of RAs, the introduction of the new RC position, and Adams's provision of its own health insurance plan.[6] We observe that none of these statements explicitly announced that Adams intended to change the terms and conditions of the RAs' employment. Ultimately, we find it unnecessary to resolve whether or not these comments placed the RAs on constructive notice because we have already determined that Adams discriminatorily failed to hire the employees of its predecessor in order to avoid incurring a bargaining obligation.

Under these circumstances, Adams forfeited its right to set initial terms. "[A]n employer that attempts to avoid successorship th[r]ough discriminatory hiring practices forfeits its right to set initial terms and conditions of employment." *Pressroom Cleaners*, 361 N.L.R.B. No. 57, at *1; *see also N.L.R.B. v. Katz,* 369 U.S. 736, 743 (1962) ("We hold that an employer's unilateral change in conditions of employment under negotiation is similarly a violation of s[ection] 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of s[ection] 8(a)(5) much as does a flat refusal."). Consequently, Adams

---

[6] Adams additionally argues that Horizons employees were placed on notice by the proposed staffing model that MJLM and Adams included in their joint proposal to the DOL. Adams does not assert, however, that Horizons employees were privy to the DOL proposal. Consequently, any information contained in the proposal is immaterial to our inquiry, which is conducted from the employees' perspective. *See Fall River*, 482 U.S. at 43–44; *N.L.R.B. v. Hous. Bldg. Servs., Inc.*, 936 F.2d 178, 180 & n.1 (5th Cir. 1991) (per curiam). Adams also points out that the offer letters and employment agreements provided to new hires apprised them of different terms and conditions. But this information was provided only after the February 13 meeting and is therefore insufficient to satisfy the notice requirement. *See, e.g., Canteen Co.*, 317 N.L.R.B. 1052, 1054 (1995), *enforced sub nom. Canteen Corp. v. N.L.R.B.*, 103 F.3d 1355 (7th Cir. 1997).

was obligated to maintain the status quo by honoring the substantive terms of the CBA and to bargain with the Union about all changes to mandatory subjects of bargaining.

We therefore affirm the Board's finding of Sections 8(a)(5) and (1) violations for Adams's unilateral imposition of new terms and conditions of employment. We also affirm the Board's ordered remedy that Adams, upon request by the Union, retroactively restore the CBA's terms and rescind the unilateral changes Adams made until such time as it and the Union reach an agreement on new terms or a lawful impasse based on good-faith negotiations.

In its Reply, Adams argues that this remedy is improper because it subsequently recognized and bargained with the Union. As a threshold matter, arguments made only in a party's reply brief are forfeited. *See Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 260 n.3 (5th Cir. 2009). But even if Adams had not forfeited this argument, we would still enforce this part of the Board's order.

There is substantial agreement among our sister circuits that "[i]n such cases the Board may impose a *status quo ante* remedy to restore the situation to what it would have been absent the successor's unfair labor practices." *See U.S. Marine Corp.*, 944 F.2d at 1320 (collecting cases); *see also Love's Barbeque Rest. No. 62*, 245 N.L.R.B. 78, 82 (1979), *enforced in part sub nom. Kallmann v. N.L.R.B.*, 640 F.2d 1094 (9th Cir. 1981); *accord Pressroom Cleaners*, 361 N.L.R.B. No. 57, at *1–2. Adams cites no decision from this court, or any other, denying enforcement of the traditional *Love's Barbeque* remedy because the employer began complying with its obligations under the Act at some point after its initial violations. And one of the Board's decisions that Adams does cite demonstrates the flaw in its logic.

In *Pressroom Cleaners*, the Board clarified that in showing compliance with a *Love's Barbeque* remedy, "the employer is not permitted to show . . . that

it would have agreed to different terms, or reached impasse earlier, if it had bargained lawfully in the first place." 361 N.L.R.B. No. 57, at \*3. *Pressroom Cleaners* indicates that Adams's subsequent participation in the bargaining process does not dissipate its initial violation of unilaterally imposing its own terms and conditions of employment. Nor does it make bargaining unit employees whole but for Adams's unfair labor practice. Accordingly, we hold that restoring the *status quo ante* is an appropriate remedy for Adams's unlawful conduct.

C. ***The Board Did Not Err in Ordering Adams to Recognize the Union as the Bargaining Representative for the RCs***

Adams argues that the Board erred by ordering it to rescind its unlawful transfer of bargaining unit work from the RA to the RC position and to recognize and bargain with the Union as the exclusive representative of RCs. Adams asserts that this is an extraordinary remedy akin to a *Gissel* bargaining order. Such orders bypass a union election and direct an employer to begin bargaining with the union immediately. *See N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 582–86 (1969). The propriety of *Gissel* orders are limited to exceptional cases where the employer's attempts to circumvent the election process indicate that the Board's traditional remedies cannot ensure a fair election. *Id.* at 610–15.

The Board rejected this argument in denying Adams's motion for reconsideration. *See Adams & Assocs., Inc.,* Nos. 20-CA-130613 & 20-CA-138046, 2016 WL 4087594, at \*2 (N.L.R.B. July 29, 2016). The Board held that an order to recognize and bargain with the union is the traditional remedy for an employer's unlawful unilateral transfer of bargaining unit work to a non-unit position. *Id.* (citing *Dixie Elec. Membership Corp.*, 358 N.L.R.B. 1089, 1094 (2012), *vacated*, 361 N.L.R.B. No. 107 (Nov. 19, 2014), *enforced sub nom. Dixie Elec. Membership Corp. v. N.L.R.B.*, 814 F.3d 752 (5th Cir. 2016), and *Mt. Sinai Hosp.*, 331 N.L.R.B. 895, 912 (2000), *enforced sub nom. N.L.R.B. v. Mt. Sinai Hosp.*, 8 F. App'x 111 (2d Cir. 2001) (per curiam)).

No. 16-60333

We conclude that the Board's remedy is sufficiently within its broad discretion to fashion. *See Fibreboard Paper Prods. Corp. v. N.L.R.B.*, 379 U.S. 203, 216 (1964) ("The Board's [remedial] power is a broad discretionary one, subject to limited judicial review."). Furthermore, Adams's analogy to *Gissel* is misplaced. *Gissel* orders remedy pre-election unfair labor practices. Here, the Union was the duly elected bargaining agent for RA bargaining unit work. The Board found that the duties of RC and RA employees are substantially identical. Adams does not dispute this. Transferring bargaining unit work to non-unit personnel is a mandatory subject of bargaining; an employer's unilateral transfer of such work violates the Act. *Hampton House*, 317 N.L.R.B. 1005, 1005 (1995) ("[O]nce a specific job has been included within the scope of the bargaining unit by either Board action or the consent of the parties, the employer cannot remove or modify the position without first securing the consent of the union or the Board."). The traditional remedy for such a violation is to order the employer to recognize the union as the bargaining representative for employees in the non-unit position to which the unit work was transferred. *See, e.g.*, *Mt. Sinai Hosp.*, 8 F. App'x at 116 (enforcing order requiring employer to include in bargaining unit all employees in non-unit position to which employer unlawfully transferred work); *Great Lakes Chem. Corp.*, 967 F.2d at 262–63 (same).

Adams attempts to sidestep this remedy by arguing that the RC position is a supervisory position pursuant to Section 2(11) of the NLRA and thus exempt from bargaining. *See Dynasteel Corp. v. N.L.R.B.*, 476 F.3d 253, 257 (5th Cir. 2007) ("The NLRA generally only protects employees, thereby excluding supervisors from its protections."). Adams has the burden of demonstrating a job position's supervisory status. *Id.* at 257–58. The ALJ found, and the Board affirmed, that RCs are not supervisory employees because "[t]here is no dispute that RCs have no authority to hire, transfer, suspend, layoff, discharge, recall, promote, reward, or assign duties," nor can they "meaningfully recommend

22

such actions." *See* 29 U.S.C. § 152(11). Adams renews the same argument that the Board rejected, namely that RCs are supervisors because they "oversee the dorm area, regularly fill in for managers and supervisors, and manage staff on occasion." We agree with the Board that the RCs' intermittent substitution for supervisors without any other indicia of supervisory authority does not transform them into supervisors. *See Masterform Tool Co.*, 327 N.L.R.B. 1071, 1071 (1999) ("[T]he exercise of some 'supervisory authority' in a merely . . . sporadic manner does not confer supervisory status.").

**D.** *The Board Did Not Err in Finding that Adams Violated the Act by Refusing to Grant Taylor Access to the Center*

Adams challenges the Board's finding that it committed a Section 8(a)(5) violation by barring Taylor from access to the Center for collective-bargaining sessions. As Union president, Taylor was the Union's chosen representative for bargaining with Adams. When Horizons operated the Center, bargaining sessions typically took place there. But Adams denied Taylor access to the Center, citing its facility access rule:

> Former staff and students, regardless of reason for separation, will not be allowed on Center without the prior authorization of the Center Director or his/her designee.

> No group or individual who has been previously barred from the Center or whose purpose can reasonably be expected to create controversy or disturbance among staff members or students, or who might interfere with their welfare or training, will be allowed on-Center.

As a result, the first three collective-bargaining sessions took place off-site at the Union's office. After the third session, Taylor was permitted on the Center. The fourth session took place there.

"It is well established that each party to a collective-bargaining relationship has both the right to select its representative for bargaining and negotiations and the duty to deal with the chosen representative of the other

party." *See Fitzsimons Mfg. Co.*, 251 N.L.R.B. 375, 379 (1980), *enforced sub nom. Int'l Union, United Auto, Aerospace & Agr. Implement Workers of Am. v. N.L.R.B.*, 670 F.2d 663 (6th Cir. 1982). The General Counsel relies on *Modern Management Services, LLC*, 361 N.L.R.B. No. 24, 2014 WL 4076358 (Aug. 18, 2014), *enforced sub nom. Modern Mgmt. Servs., LLC v. N.L.R.B.*, No. 14-1160, 2016 WL 3040484 (D.C. Cir. May 18, 2016), and *KSL Claremont Resort, Inc.*, 344 N.L.R.B. 832 (2005), to argue that a ban on union representatives who are also former employees constitutes a refusal to bargain with the Union's chosen representative in violation of Section 8(a)(5) of the Act. In both cases, the Board found Section 8(a)(5) violations stemming from an employer's refusal to allow a former employee access to its facility to carry out union-related responsibilities.

But Adams asserts that it should not be liable because there was no evidence that its enforcement of its facility access rule was either selective or disparate. Adams cites us no authority indicating that non-selective enforcement of its rule is material. The probative facts are that Taylor was the Union's chosen representative and that she was denied access to the location typically used for bargaining sessions. Moreover, Adams does not contend that her presence would create ill will and render good-faith negotiations impossible, such that it would be justified in refusing to meet with her. *See KSL Claremont*, 344 N.L.R.B. at 835.

Adams also argues that liability is inappropriate because Taylor's inability to be on-site did not actually hinder bargaining. But a Section 8(a)(5) violation does not require a showing that the employer absolutely impeded the bargaining process. In *Modern Management*, the Board found a Section 8(a)(5) violation despite evidence that the employer was willing to bargain, and had bargained, with the former employee as union representative at other locations than the employer's facility. The ALJ found that Taylor's presence as Union president was of paramount importance to the Union. Prior to her ban from

the Center, bargaining sessions ordinarily took place there. It was undoubtedly less convenient to hold sessions elsewhere, particularly for any current Center employees who might wish to participate.

Because there is substantial evidence, *i.e.*, more than "a mere scintilla," *UNF W.*, 844 F.3d at 456, supporting the Board's finding that Adams refused to bargain in good faith by denying Taylor access to the Center, we affirm.

E. ***The Board's Finding that Adams and MJLM Are Joint Employers Is Supported by Substantial Evidence***

Adams and MJLM contest the finding that they are joint employers, jointly and severally liable for unfair labor practices.

As an initial matter, MJLM spends a significant portion of its brief arguing that the Board's purportedly new joint-employer test, announced in *Browning-Ferris Industries of California, Inc.*, 362 N.L.R.B. No. 186 (Aug. 27, 2015), is arbitrary and capricious. Whatever the merits of that test may be, it is not properly before us. The ALJ and the Board relied on the test for joint-employer status propounded in *N.L.R.B. v. Browning-Ferris Industries Inc.*, 691 F.2d 1117 (3d Cir. 1982), which we have previously endorsed, *see Tex. World Serv. Co., Inc. v. N.L.R.B.*, 928 F.2d 1426, 1432 (5th Cir. 1991). Under this test, joint employers "share or co-determine those matters governing essential terms and conditions of employment." *Id.* (quoting *Browning-Ferris Indus. Inc.*, 691 F.2d at 1124); *see also Laerco Transp.*, 269 N.L.R.B. 324, 325 (1984). "To establish joint employer status there must be a showing that the employer meaningfully affects matters relating to the employment relationship such as hiring, firing, discipline, supervision, and direction." *Laerco Transp.*, 269 N.L.R.B. at 325. "Whether a joint employer relationship exists is 'essentially a factual issue.'" *Tex. World Serv.*, 928 F.2d at 1432 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). The relevant time period for assessing joint-employer status

is the period in which the unfair labor practices occurred—here, the transition period. *Id.*

The ALJ relied on the following facts demonstrating joint-employer status: (1) Adams and MJLM jointly developed the wage structure for all staffing; (2) MJLM personnel were involved in the interviewing and hiring process of Adams's employees; (3) MJLM exclusively determined the holiday schedule for all Center employees; (4) MJLM reserved the right to take personnel action against Adams staff for violation of Center rules or policies; (5) Adams Deputy Center Director McGillis reported directly to MJLM Center Director Evans; and (6) Adams shared interview forms, standard operating procedures, and job descriptions with MJLM during the transition. The Board adopted these findings in full. It also noted that "MJLM does not contend that it neither knew, nor should have known, of Adams' unlawful actions. Nor does it contend that it took all measures within its power to resist those actions."

By contrast, the ALJ found that, in general, Adams is solely responsible for setting the staff schedule for its employees and for ensuring that its staff meets all hiring criteria required by the DOL; there is no evidence that MJLM retains authority over hiring, supervision, and direction of Adams employees; and the two companies have separate benefits packages and disciplinary policies.

On balance, this is a close case for joint-employer liability. Our standard of review, however, is deferential. We must uphold the Board's decision if it is reasonable, even if we might have reached a different conclusion had the matter been presented to us in the first instance. *UNF W.*, 844 F.3d at 456–57. There is sufficient evidence in the record to support the Board's finding.

First, there is the joint development of the wage structure, which MJLM and Adams submitted in their proposal to the DOL. A significant factor in determining whether one company has immediate control over another company's employees is influence over wages. *See Tex. World Serv.*, 928 F.2d

at 1432 (citing *Clinton's Ditch Coop. Co. v. N.L.R.B.*, 778 F.2d 132, 138 (2d Cir. 1985)). Adams disputes that MJLM had any role in setting wages for Adams employees. But in an affidavit, which the ALJ credited, Gagnon stated that the two companies "jointly developed" the wage structure. The ALJ also relied on the joint proposal to the DOL in finding that the companies jointly developed the wage structure for all staffing at the Center. The ALJ's credibility determination is reasonable.

Second, it is undisputed that MJLM was involved in the hiring process for Adams employees during the transition period. Influence over hiring decisions is another significant factor in the joint-employer determination. *See, e.g.*, *id.* at 1433; *N.L.R.B. v. W. Temp. Servs., Inc.*, 821 F.2d 1258, 1266 (7th Cir. 1987). MJLM personnel, including MJLM Partner Murphy, conducted interviews of Adams applicants and made hiring recommendations. During the transition period, MJLM and Adams also daily reviewed the latest hiring data and open positions remaining to be filled. These activities are indicative of coordination in hiring during the relevant period.

Third, in the subcontract agreement between MJLM and Adams, MJLM's exclusive determination of the holiday schedule for Center staff is some evidence of its influence over the terms and conditions of employment for Adams employees. *See Quantum Res. Corp.*, 305 N.L.R.B. 759, 760–61 (1991). We agree with Petitioners, however, that the reservation of MJLM's right to discipline Adams staff for violation of Center rules and policies is insufficient to establish a joint-employer finding, absent evidence that the right was ever exercised. *See Am Prop. Holding Corp.*, 350 N.L.R.B. 998, 1000 (2007) ("In assessing whether a joint employer relationship exists, the Board does not rely merely on the existence of such contractual provisions, but rather looks to the actual practice of the parties.").

Fourth, the direct reporting structure between McGillis, the highest ranking Adams representative on site, and Evans, the Center Director, reflects the reality of the companies' joint relationship in operating the Center and the coordination necessary to ensure a seamless operation. The ALJ found that McGillis and Evans consulted on matters such as students, dormitories, career and social counseling, and policies of the Center. Similarly, Weldon and MJLM HR Director Barrett shared an office during the transition and "consulted with each other on human resources matters."

Finally, Adams shared interview forms, standard operating procedures, and job descriptions with MJLM during the transition. Pagni described Adams's relationship with MJLM as not only a subcontractor but also a mentor. Adams operates roughly sixteen Job Corps Centers as the prime contractor. The Sacramento Jobs Corps Center was Adams's first experience as a subcontractor. At the Sacramento Center, the companies decided "to be under the same umbrella." Consequently, forms that Adams typically utilized were given to MJLM to revise and use. This is further evidence supporting the Board's joint-employer finding. *See Browning-Ferris Indus.*, 691 F.2d at 1125 (sharing of forms for record keeping purposes indicative of joint-employer status).

Adams and MJLM rely heavily on two NLRB decisions: *Laerco Transportation*, 269 N.L.R.B. 324 (1984), and *TLI, Inc.*, 271 N.L.R.B. 798 (1984). Both cases involved servicing relationships, in which one company contracted for labor provided by another. Although the contracting company in each case exercised some control over the supplier's labor force, the Board found that the control was minimal and routine in nature; it did not meaningfully affect the terms and conditions of employment. *See Laerco Transp.*, 269 N.L.R.B. at 325–26; *TLI, Inc.*, 271 N.L.R.B. at 799. Petitioners argue that MJLM also exercised only minimal control of a routine nature over Adams employees and did not materially affect the terms and conditions of their employment.

No. 16-60333

*Laerco* and *TLI* are distinguishable. None of the aforementioned factors was present in those cases. The nature of Petitioners' relationship as prime contractor and subcontractor jointly operating the Sacramento Center is different than the customer/supplier relationships at issue in *Laerco* and *TLI*. And the record as a whole demonstrates that the level of control MJLM exercised over Adams Center employees rose above the minimal showing in *Laerco* and *TLI*. Moreover, MJLM's influence over Adams employees, including its participation in the hiring process and the management reporting structure, is far from routine in nature.

In sum, there is substantial evidence in the record to support the Board's joint-employer finding. Under the Board's precedent, the burden then shifts to MJLM in seeking to escape liability "to show that it neither knew, nor should have known, of the reason for the other employer's action or that, if it knew, it took all measures within its power to resist the unlawful action." *Capitol EMI Music*, 311 N.L.R.B. 997, 1000 (1993), *enforced sub nom. Capitol EMI Music, Inc. v. N.L.R.B.*, 23 F.3d 399 (4th Cir. 1994). MJLM has not made this showing. Accordingly, the Board's finding of joint liability is appropriate.

## IV.   CONCLUSION

Because we find that, on the record as a whole, substantial evidence supports the Board's findings and conclusions, the Petition for review is DENIED. The Board's Cross-Petition for enforcement of its order is GRANTED.