**REVISED October 16, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-60715

United States Court of Appeals
Fifth Circuit

**FILED**

September 25, 2017

Lyle W. Cayce
Clerk

CREATIVE VISION RESOURCES, L.L.C.,

     Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,

     Respondent Cross-Petitioner

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

Before KING, PRADO, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

Creative Vision Resources, L.L.C., succeeded another company as the staffing provider for garbage trucks in New Orleans. It set its own initial terms and conditions of employment instead of bargaining with the incumbent union. The union filed an unfair-labor-practice charge against Creative, alleging violations under Section 8(a) of the National Labor Relations Act. The administrative law judge concluded, among other things, that Creative was not a "perfectly clear" successor and accordingly was within its right to set initial terms and conditions. The National Labor Relations Board reversed. Creative

## No. 16-60715

petitions this court for review, while the Board seeks enforcement of its order. We deny Creative's petition and grant the Board's petition to enforce.

### I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Richard's Disposal is a trash-collection company in the greater New Orleans area. Since 2007, Local 100, United Labor Unions has represented the "hoppers" who ride on the back of Richard's Disposal's garbage trucks and pick up trash cans. Until early June 2011, the hoppers were employed by a labor-supply company called Berry III.

Dissatisfied with Berry III's management practices, Richard's Disposal's vice president, Alvin Richard III, decided to form Creative Vision Resources, L.L.C. ("Creative"), to become the new hopper supplier. These unsatisfactory practices, according to the Board's decision, included Berry III's "treatment of the hoppers as independent contractors," which meant "Berry III paid the hoppers a flat rate of $103 per day with no overtime, and made no deductions for taxes or social security."

To prepare for the transition from Berry III to Creative, which was scheduled to take place on May 20, 2011, Richard prepared an employee handbook and safety manual. He also put together employment applications, which, along with federal and state tax forms, were to be distributed to current Berry III hoppers. Richard then personally distributed these applications along with tax forms to about 20 hoppers. He informed them that joining Creative would mean changes in the terms and conditions of their employment, including $11-per-hour pay with overtime and the deduction of taxes and social security from their paychecks.

---

[1] We draw most of our discussion of the history of the dispute from the decisions of the Board and the administrative law judge. *See Creative Vision Res., LLC*, 364 N.L.R.B. No. 91 (2016).

No. 16-60715

Richard also asked a Berry III hopper named Eldridge Flagge to help him pass out applications. Flagge passed out approximately 50 applications and tax forms between mid-May and June 1. Richard testified that he told Flagge of the new terms and conditions; Flagge denied he was told and testified he did not tell the hoppers of the changes in the prospective terms of employment.

Regardless, some of the hoppers learned of the changed terms. One hopper, Anthony Taylor, testified that the hoppers knew of the new pay rate before June 2 because "we all congregate out there in the morning. We been knowing that." A Union official also testified that at least one hopper asked her about the $11-per-hour pay rate. When she asked who told them about the pay cut, "they said they just hear it. They had not heard from any authorized personnel."

Relevant here, Creative's employee-selection process was not rigorous. Once Berry III hoppers filled out the application and tax forms, they were hired. Creative did not interview candidates, review qualifications, or check references. Rather, Richard acknowledged that he (and thus Creative) intended to offer a job to any Berry III hopper who applied.

No transition occurred on May 20 because Creative had not received enough applications to fully staff its operations. By June 1, though, Creative had about 70 completed applications from the Berry III hoppers. At this point, Richard's Disposal cancelled its contract with Berry III. Creative was to start as the new hopper supplier the next day. As the Board found, Creative directly told the hoppers about the new terms on the morning of June 2:

> At approximately 4 a.m., the hoppers assembled in the yard as usual, to await assignment to a truck. They were met by former Berry III supervisor, Karen Jackson, whom Richard had hired on June 1. Jackson informed all of the hoppers present that "[t]oday is the day you start working under Creative Vision." Jackson then

3

explained to them the terms under which they would be working, including, among other things, the $11-per-hour pay rate, the deduction of Federal and State taxes, and a number of new employment standards and safety rules. Some of the hoppers refused to work upon learning of the new terms. A sufficient number of hoppers remained, however, to staff the trucks. Thus, on its first day of operations, [Creative] supplied 44 hoppers to Richard's Disposal, all of whom were formerly employed by Berry III.

Two days later, on June 4, Creative distributed an employee handbook setting out new rules and employment standards. Then, on June 6, after learning that Creative had replaced Berry III and retained the incumbent employees, the Union hand delivered a letter to Creative demanding that it recognize the Union as the hoppers' exclusive representative for collective-bargaining purposes. Creative did not reply.

Shortly thereafter, the Union filed an unfair-labor-practice charge against Creative. Acting on behalf of the Board's Acting General Counsel, a Board Regional Director investigated and issued a complaint in March 2012. The dispute proceeded to a two-day trial, after which the administrative law judge ("ALJ") concluded that Creative violated subsections 8(a)(1) and (5) of the National Labor Relations Act (the "Act") by refusing to recognize the Union. He also concluded that Creative was not a perfectly clear successor because it "did not fail to communicate candidly with the hoppers" about its intent to set initial terms. As such, Creative did not violate the Act by setting initial terms.

In making this determination, the ALJ relied on the fact that Richard communicated the initial terms of employment to approximately 20 hoppers in May and that a rumor spread among the hoppers that Creative would be paying $11 per hour. The ALJ also heavily relied on Creative's June 2 announcement of initial terms to the hoppers who were assembled for work and were awaiting assignment.

No. 16-60715

The Board disagreed with the ALJ in part. It upheld the ALJ's finding that Creative was a successor and therefore violated subsections 8(a)(1) and (5) by refusing to recognize and bargain with the Union. It also concluded that Creative was a perfectly clear successor and had violated the Act by unilaterally imposing initial terms and conditions of employment. In its analysis, the Board looked only to Creative's communications on or before June 1, concluding the June 2 announcement was untimely. The Board concluded that Creative's pre-June 2 communications—Richard's communication of new terms to 20 hoppers, the rumors that reached an unknown number of hoppers, and the inclusion of tax forms with the applications—were insufficient. The Board concluded that the limited notice from these communications "did not negate the inference of probable continuity of employment of the remaining 50 Berry III hopper applicants, who lacked knowledge that their wages and benefits would be reduced."

One Board member dissented. He concluded that the hoppers were not formally hired until June 2, when they boarded the trucks, so he would have "examine[d] what [Creative] communicated to the hoppers *on or before June 2*." To him, then, the 4:00 a.m. June 2 meeting was enough to give notice of new terms of employment. Even if it were not, though, the tax forms attached to the applications were sufficient in his view because the hoppers did not pay income taxes when employed by Berry III. Finally, Creative's bargaining obligation was not triggered, and it could therefore unilaterally set new terms of employment, until June 6, the date the Union made its bargaining demand.

Creative now petitions this court for review, while the Board seeks to have its order enforced. Creative does not contest the Board's holding that Creative violated subsections 8(a)(1) and (5) of the Act by refusing to recognize and bargain with the Union. "[W]hen an employer does not challenge a finding of the Board, the unchallenged issue is waived on appeal, entitling the Board

5

to summary enforcement." *Sara Lee Bakery Grp. v. NLRB*, 514 F.3d 422, 429 (5th Cir. 2008). Thus, the Board is entitled to summary enforcement of the uncontested parts of its order.

## II.    DISCUSSION

Creative makes three main arguments, two of which relate to the applicability of the perfectly clear successor doctrine. Creative first argues the Board erred by concluding Creative was a perfectly clear successor and thus could not set initial terms and conditions of employment without bargaining with the Union. Creative next argues that it did not violate its bargaining obligation because at the time Creative unilaterally set terms, the Union had not sent a bargaining demand. Finally, it argues that the complaint against it, issued on behalf of the Board's former Acting General Counsel, was invalid.

We review the Board's "legal conclusions de novo and its 'factual findings under a substantial evidence standard.'" *Flex Frac Logistics, L.L.C. v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014) (quoting *Sara Lee Bakery*, 514 F.3d at 428). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. It is more than a mere scintilla, and less than a preponderance." *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (emphasis removed). "We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, 'even if the evidence preponderates against the [Board's] decision.'" *Id.* (quoting *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). This does not mean our review is *pro forma* (i.e., it is not merely a "rubber stamp"). *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314 (5th Cir. 2013). We must find the supportive evidence to be substantial. *Id.* at 314–15. On the law, the Board's "interpretation of the NLRA will be upheld 'so long as it is rational and consistent with the Act.'" *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 349 (5th Cir. 2013) (quoting *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201 (1991)).

No. 16-60715

### *a. "Perfectly Clear" Successor*

We begin our analysis of whether Creative was a perfectly clear successor with the relevant statutory language. Section 8(a) of the Act provides that "[i]t shall be an unfair labor practice for an employer . . . to interfere with" or "restrain" protected union and organization rights or "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(1), (5). The employees' representative is determined by a "majority of the employees" in the appropriate bargaining unit. *Id.* § 159(a). Under the Act, when an employer qualifies as a "successor" to another, it is "bound to recognize and bargain with the union" that represented its predecessor's employees. *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284 (1972).

That bargaining obligation, though, does not mean every successor must abide by its predecessor's terms and conditions of employment. The Supreme Court in *Burns* rejected a Board rule requiring just that, instead holding that "a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor." *Id.* at 294. No obligation to bargain before setting initial terms arises in most situations because it will normally not be evident whether the union will retain majority status until after the successor has hired a full complement of employees. *Id.* at 295. Further, the Court expressed concern that "[s]addling" a successor "employer with the terms and conditions of employment contained in the old collective-bargaining contract may make [beneficial] changes impossible and may discourage and inhibit the transfer of capital." *Id.* at 288. The Board's rejected rule would have been inconsistent with "[t]he congressional policy manifest in the Act," which "is to enable parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities." *Id.*

7

The *Burns* Court also identified a narrow exception to that rule, which applies when "it is perfectly clear that the new employer plans to retain all of the employees in the [bargaining] unit and in which it will be appropriate to have [it] initially consult with the employees' bargaining representative before [it] fixes terms." *Id.* at 294–95. Thus, two types of successors emerged from *Burns*: an "ordinary" successor, who is "free to set initial terms on which it will hire the employees of a predecessor," and a "perfectly clear" successor, who must bargain with the employees' union before changing terms to which its predecessor had agreed. *See id.*

Shortly after *Burns*, the Board decided *Spruce Up*, where it tried to set boundaries for the perfectly clear exception. *See Spruce Up Corp.*, 209 N.L.R.B. 194, 195 (1974), *enforced*, 529 F.2d 516 (4th Cir. 1975). In *Spruce Up*, the Board focused not only on whether the successor intended to retain its predecessor's employees, but also on whether the incumbent employees would accept the successor's offer of employment. *See id.* Critical to whether the incumbent employees would accept, and thus allow the union to retain majority status, are the successor's terms of employment. *Id.* As the Board explained:

> When an employer who has not yet commenced operations announces new terms prior to or simultaneously with his invitation to the previous work force to accept employment under those terms, we do not think it can fairly be said that the new employer "plans to retain all of the employees in the unit," as that phrase was intended by the Supreme Court.

*Id.* The Board cautioned that a broader reading of *Burns*, which focused only on whether the successor intended to retain the employees, would cause successors "to refrain from commenting favorably at all upon employment prospects of old employees" so as to retain their "right to unilaterally set initial terms, a right to which the Supreme Court attache[d] great importance in *Burns*." *Id.* Instead, under *Spruce Up*'s test, what a new employer must avoid

is misleading employees or otherwise failing to provide notice of changing employment terms:

> [T]he caveat in *Burns* . . . should be restricted to circumstances in which the new employer has either actively, or by tacit inference, misled employees into believing they would all be retained without changes in their wages, hours, or conditions of employment, or at least to circumstances where the new employer . . . has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Id.* (footnote omitted).

We have summarized the holdings of *Burns* and *Spruce Up* as follows: While "a successor employer is ordinarily free to set initial terms on which it will hire its predecessor's employees, when a successor evinces a 'perfectly clear' intention to retain the predecessor's employees, it must consult with their bargaining representative before fixing its own terms." *Adams & Assocs., Inc. v. NLRB*, No. 16-60333, 2017 WL 4079063, at *8 (5th Cir. Sept 15, 2017). A successor set on retaining its predecessor's employees may dispel this "perfectly clear" intention by giving employees "prior notice of its intention" to institute its own initial terms or by "hold[ing] itself" as if it will not adhere to the terms of the previous collective-bargaining agreement ("CBA"). *NLRB v. Hous. Bldg. Servs., Inc.*, 128 F.3d 860, 864 n.6 (5th Cir. 1997) (per curiam).

Creative does not dispute that it is a successor, so we focus on whether it was a "perfectly clear" one. The key question here is whether Creative provided sufficient and timely notice of its intent to change the hoppers' terms and conditions of employment, thereby clarifying that it was an ordinary rather than perfectly clear successor.

The Board held that Creative was a perfectly clear successor. To the Board, June 1 rather than June 2 was the date by which Creative had to give notice of its intent to offer employment on different terms, so Creative's June 2

announcement was irrelevant. As to the pre-June 2 communications, the Board concluded: (1) Richard did not tell Flagge about the new terms of employment and therefore Flagge did not tell those terms to the 50 Berry III hoppers he gave applications to; (2) Richard's communication of new terms to approximately 20 Berry III hoppers and the subsequent word-of-mouth spread of those new terms were insufficient to put a majority of Creative's hoppers on notice; and (3) inclusion of tax forms "without explanation, let alone an express announcement that taxes would be withheld from the hoppers' pay, was too ambiguous" for "a reasonable employee in like circumstances [to] understand that continued employment [was] conditioned on acceptance of materially different terms." *Creative Vision Res., LLC*, 364 N.L.R.B. No. 91, slip op. at 4–6 & n.12 (2016).

Creative disputes each of these conclusions. It argues that its June 2 announcement of new terms was timely because the announcement preceded the formal hiring of Berry III's hoppers. Creative also argues that its pre-June 2 communications with the hoppers were sufficient to put them on notice. First, the Board erred by improperly substituting its credibility determinations for the ALJ's over whether Richard told Flagge of the new terms of employment. Second, the Board erred by rejecting the credited evidence of the word-of-mouth communications between the hoppers. Finally, Creative argues that the Board's conclusion about the ambiguity of the tax forms "demeans the hoppers," as any American worker would realize that a tax form indicating that the employer will deduct taxes means the employer intends to do just that.

We consider each of these arguments in turn.

### i. The June 2 Announcement

The Board's conclusion that Creative's June 2 announcement was untimely is well founded. To reach this conclusion, the Board summarized its past decisions as holding that a successor employer may unilaterally set initial

terms of employment if it "clearly announce[s] its intent to establish a new set of conditions prior to, or simultaneously with, its expression of intent to retain the predecessor's employees." *Id.* at 3. But after the successor expresses its intent to retain the predecessor's employees, an announcement of new terms, "even if made before formal offers of employment are extended or the successor commences operations, will not vitiate the bargaining obligation." *Id.* The Board's justification for this prior-or-simultaneous-announcement requirement is as follows:

> [A] new employer that expresses an intent to retain the predecessor's work force without concurrently revealing to a majority of the incumbent employees that different terms will be instituted, improperly benefits from the likelihood that those employees, lacking knowledge that terms and conditions will change, will choose to stay in the positions they held with the predecessor, rather than seeking employment elsewhere.

*Id.* at 6. After stating the legal standard it would apply, the Board found that Creative expressed an intent to retain Berry III's employees between mid-May and June 1.

This court has briefly spoken twice about the timing of an announcement of new terms and its effect on notice. We recently observed in *Adams & Associates* that a communication of new employment terms through offer letters and employment agreements was untimely because the communication occurred after the successor evinced an intent to retain its predecessor's employees. *Adams & Assocs.*, 2017 WL 4079063, at *8. In *Houston Building Services*, we opined that a successor may not set its own initial terms if it fails to give "prior notice of its intention" and it "holds itself as if it will adhere to the terms of the previous CBA." *Hous. Bldg. Servs.*, 128 F.3d at 864 n.6. We turn to our sister circuits for further guidance.

No. 16-60715

The D.C. Circuit explicated the rationale for prior or simultaneous announcement of new terms in *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. NLRB*, 595 F.2d 664 (D.C. Cir. 1978). There, the D.C. Circuit approved of *Spruce Up*'s qualification of *Burns*'s perfectly clear exception. *Id.* at 674. Recall that the *Spruce Up* Board held that it is not "perfectly clear" that a successor "plans to retain all" the predecessor's employees when it also plans to impose new terms on those employees. *Spruce Up*, 209 N.L.R.B. at 195. The successor can reasonably anticipate that some incumbents will balk at and decline the new terms. *See id.* This qualification, while sensible, generates an additional problem, one the D.C. Circuit identified:

> [I]n the Board's view . . . the successor . . . may endeavor to conceal, or at least postpone publicity on, reemployment objectives in order to avoid the onus of bargaining during the usually difficult period of takeover, and the incumbent employees may thereby be deprived of early appraisal of their retention prospects.

*Int'l Ass'n of Machinists*, 595 F.2d at 675. To provide an "important measure of protection" against this possibility, the Board adopted and the D.C. Circuit approved a prior-or-simultaneous-announcement requirement. *Id.* at 674. Such a requirement ensures that incumbent employees will not be "lulled into a false sense of security" by a successor's announcement that it intends to retain the incumbents. *Id.* at 675; *see also S & F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 359 (D.C. Cir. 2009) ("[A]t bottom the 'perfectly clear' exception is intended to prevent an employer from inducing possibly adverse reliance upon the part of employees it misled or lulled into not looking for other work."). The D.C. Circuit went on to note that even when a subsequent announcement of new terms occurs before actual hiring, incumbent employees may "lack . . . sufficient time to rearrange their affairs." *Int'l Ass'n of Machinists*, 595 F.2d at 675 n.49. In those situations, they may "be forced to

continue in the jobs they held under the successor employer, notwithstanding notice of diminished terms." *Id.*

The Seventh Circuit has found this reasoning persuasive. In *Canteen Corp.*, it approved the Board's rejection of the view "that the obligation to bargain only arose when the employer had failed to announce the initial employment terms prior to, or simultaneously with, the extension of unconditional job offers to the predecessor employees." *Canteen Corp. v. NLRB*, 103 F.3d 1355, 1360, 1364–65 (7th Cir. 1997). Similarly, the Sixth Circuit, in *DuPont Dow*, held that the announcement of new terms before operations commenced but after formal offers were made and accepted came too late. *See DuPont Dow Elastomers, L.L.C. v. NLRB*, 296 F.3d 495, 506 (6th Cir. 2002).

We are persuaded by the Board's and D.C. Circuit's reasoning of the wisdom of the prior-or-simultaneous-announcement requirement. We apply it here and find, after careful examination of the record and the Board's inferences drawn therefrom, that substantial evidence supports the Board's conclusion that Creative expressed an intent to retain the Berry III hoppers by June 1. Thus, Creative's announcement of new terms on June 2 was untimely.

The record reflects that the shift from Berry III to Creative would be abrupt, so Creative needed to ensure it had hoppers lined up in advance. Creative distributed 70 applications to Berry III hoppers and made no efforts to hire hoppers from other sources.[2] Creative had no reason to do so. Richard

---

[2] Creative argues that it sought applicants from sources other than Berry III's hoppers. It did not, however, file an exception to the ALJ's finding to the contrary, and therefore the Board found that Creative was procedurally foreclosed from raising the issue. Under the circumstances, we will not consider this question. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665 (1982) (stating that § 160(e) precludes a court of appeals from reviewing claims not raised to the Board).

knew the quality of the hoppers' work, and his dissatisfaction was not with the hoppers but with Berry III's management. Further, finding and training new hoppers would have been a major undertaking, delaying what was supposed to be a rapid transition. Richard did not interview any applicants or perform reference checks on them, and he testified that he was agreeing to hire Berry III hoppers who submitted applications. The distributed applications also contained W-4s—a tax form that is, as the Board noted, typically filled out after an employee is hired. From these facts, the Board inferred that the hiring process was a formality and that Creative sought to hire the Berry III hoppers en masse. And that is just what happened. On June 1, when Creative had enough Berry III applicants, Richard cancelled Berry III's contract with Richard's Disposal. All 44 hoppers Creative employed on the first day of operations were previously employed by Berry III. A reasonable mind could accept such evidence and inferences as sufficient to support the conclusion that by June 1, Creative had expressed an intent to retain the Berry III hoppers.

Creative argues that its whole hiring process was "in flux" up until June 2 when the hoppers hopped on the trucks. It was only at that point that the hoppers were formally hired and it became "perfectly clear" how many would accept Creative's new terms. Creative relies on *Emerald Maintenance, Inc. v. NLRB*, 464 F.2d 698 (5th Cir. 1972), to argue that the delay caused by insufficient hopper applications and uncertainty over how many hoppers would accept the new terms indicates that the Union's majority status was not clear "until after the work force had been assembled" on June 2. *See id.* at 701. There, Emerald required the incumbent employees to reapply for their jobs and refused to recognize the union's referral slips. *Id.* at 700. This refusal contravened its predecessor's CBA, which required the predecessor to fill all its positions with union members. *Id.* Emerald built up its workforce after commencing operations and hired a significant number of non-incumbents. *Id.*

14

This court found that Emerald was not a perfectly clear successor because "it was not clear that a majority of Emerald employees were union members until after the work force had been assembled." *Id.* at 701.

*Emerald* differs in key ways from this case. Unlike Creative's application process, Emerald's was not *pro forma*—it hired a significant number of non-incumbents and refused to hire union members simply because they were union. Emerald indicated from the outset that it intended to set its own terms by refusing to follow the terms of the CBA during the application process. Emerald built its workforce after it commenced operations and did so gradually (unlike Creative), making it less evident that the incumbent union's majority status would continue. Finally, the procedural posture of *Emerald* informs our understanding of it. There, we considered the case without owing deference to a Board finding of perfectly clear successorship. (Remember that *Burns* was decided in the interim between the Board's decision in *Emerald* and ours. *Id.* at 699–700.) Here, by contrast, the Board has found that Creative is a perfectly clear successor, and we do not review de novo but for substantial evidence.

Creative is also wrong to assume that an expression of intent to retain the incumbent workforce is limited to express announcements or formal hiring. *Canteen Corp.* is particularly instructive in this regard. There, the Seventh Circuit refused to disturb the Board's determination that, based on the "totality of Canteen's conduct," Canteen formed an intent, "albeit unannounced," to retain its predecessor's employees. *Canteen Corp.*, 103 F.3d at 1363. This was in spite of the fact that Canteen "never announced an intention to employ the predecessor's employees" and never "state[d] that they would be hired under the predecessor's terms and conditions." *Id.* at 1362. Reviewing the totality of Canteen's conduct, the Board and the court found particularly relevant that Canteen "neglected to take serious steps to recruit from other sources." *Id.* at 1363. Here, we similarly find substantial evidence

to support the Board's finding that, based on the totality of Creative's conduct (and in particular its failure to take serious steps to recruit outside of Berry III's workforce), Creative intended to retain Berry III's hoppers by June 1.

Finally, we note that the facts of this case make it unnecessary for us to consider whether there are some situations where a subsequent announcement of new terms before formal hiring or commencement of operations will be timely.[3] In this case, the June 2 announcement clearly was untimely. The announcement occurred the same day the hoppers were formally hired and Creative's operations commenced. This same-day announcement gave the hoppers insufficient time to rearrange their personal affairs.

### ii.  Pre-June 2 Communications

Having concluded that Creative's June 2 announcement of new terms was untimely, we turn now to whether Creative gave notice of its intent to establish new terms on or before June 1. In analyzing this issue, we consider the cumulative effect of three pre-June 2 communications from Creative to the hoppers: (1) Richard's alleged communication to Flagge about the new terms of employment; (2) Richard's communication of the new terms to about 20 hoppers and the subsequent word-of-mouth exchanges among the hoppers; and (3) the inclusion of tax withholding forms with the job applications. We

---

[3] The Second Circuit indicated as much in *Nazareth Regional High School v. NLRB* when it read *Spruce Up* as:

> limited to those situations where employees are led at the outset by the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force.

549 F.2d 873, 881 (2d Cir. 1977) (quoting *Bhd. of Ry. Clerks v. REA Express, Inc.*, 523 F.2d 164, 171 (2d Cir. 1975)).

conclude that all three combined did not provide a majority of Creative's hoppers with sufficient notice of the new terms.

We turn first to Richard's alleged conversations with Flagge. Recall that Flagge, a hopper, spoke to Richard and passed out about 50 applications to other hoppers. There is a dispute about what Richard told Flagge. Richard claimed he told Flagge about the new terms. Flagge denied this. The Board ultimately sided with Flagge, concluding that "Richard did not inform Flagge of the new terms and conditions of employment and, consequently, Flagge did not inform any of the hoppers to whom he gave applications that their terms and conditions would change under [Creative]." *Creative*, slip op. at 1.

Creative argues that the Board erred by siding with Flagge. In Creative's view, the ALJ credited Richard as "a sincere and meticulous witness," and thus necessarily credited Richard's testimony that he told Flagge the new terms. By reaching the opposite credibility finding than the ALJ, who actually saw the witnesses, the Board's credibility choice was unsupported by substantial evidence.

In making this argument, Creative mischaracterizes the ALJ's and Board's findings. The Board could not have erred in dismissing the ALJ's credibility determination over what Richard told Flagge because the ALJ did not make a credibility determination over what Richard told Flagge. While ALJ "credibility determinations are binding except in rare instances," *Adams & Assocs.*, 2017 WL 4079063, at *8, no relevant ALJ credibility determination was made here. In order to see why, a detailed review of the ALJ's decision is necessary.

The ALJ began his analysis of Richard's testimony by stating that Richard said that he told Flagge about the new terms. The ALJ then noted that "Flagge's testimony squarely contradicts Richard . . . on this point." *Creative*, slip op. at 20 (ALJ op.). Flagge said that Richard did not tell him anything

about the new terms. The ALJ then moved to a separate issue in Richard's testimony regarding how he had passed out applications to about 20 other hoppers and told them about the new terms. Regarding this testimony, the ALJ noted that the hoppers did not corroborate Richard's testimony. But the ALJ also noted that other factors made Richard appear credible, such as Richard's appearance as a meticulous witness. Thus, the ALJ was confronted with whether to credit Richard's testimony about two different purported communications: (1) what Richard told Flagge, and (2) what Richard told the 20 hoppers.

Given this context, the ALJ's finding becomes clear. The ALJ credited Richard's testimony only with respect to what he told the 20 hoppers, not with respect to what he told Flagge. Specifically, the ALJ's credibility finding on this point was the following:

> This finding, that hoppers working for Berry III learned some information about [Creative] from Jackson, does not contradict Richard['s] . . . testimony that he informed hoppers about [Creative's] initial terms of employment. Although Richard['s] . . . testimony is uncorroborated, *it is also uncontradicted*. Moreover, it is consistent with the fact that at least some hoppers knew about the contemplated $11-per-hour wage rate.
>
> Further, as discussed above, Richard . . . appeared to be a sincere and meticulous witness. For these reasons, I credit his testimony that he told some of the hoppers—those to whom he gave employment application forms—that [Creative] would be paying an $11-per-hour wage, would guarantee 8 hours of employment per day, would pay overtime for hours worked in excess of 40 per week, and would withhold taxes from their paychecks. Based on Richard['s] . . . credited testimony, I also find that he told these hoppers that [Creative] guaranteed four holidays.

*Id.* at 22.

As the emphasized portion highlights, the ALJ's credibility finding relates only to Richard's testimony that he told the 20 hoppers about the new terms. How could the ALJ credit Richard's testimony about his communications with Flagge as "uncontradicted" when the ALJ explicitly described that testimony earlier as being "squarely contradict[ed]?" Instead, the ALJ's finding should be read to mean what it says: the ALJ credited Richard's uncorroborated and uncontradicted testimony about what he told the 20 hoppers, not the contradicted testimony about what he told Flagge.

And this reading makes sense. This is not a case where the ALJ implicitly but necessarily resolved a credibility dispute. In the ALJ's eyes, Richard telling 20 hoppers about the new terms was sufficient (among other circumstances, including the June 2 communications) to evade the perfectly clear exception. The ALJ therefore had no reason to decide whether Richard or Flagge was being truthful with respect to their conversation because the ALJ's conclusion did not hinge on that determination. Finally, we note that the Board's reading of the ALJ's decision appears to match our own. The Board never stated that it was dismissing an ALJ credibility determination. In fact, with regard to the ALJ's credibility findings, the Board expressly stated that it found no basis for reversing the findings. *Id.* at 1 n.1.

We are left with a situation in which the ALJ did not make a credibility finding for this dispute and the Board found that "Richard did not inform Flagge of the new terms and conditions of employment." *Id.* at 1. Under these circumstances—where (1) the ALJ did not resolve the factual dispute raised by the conflicting testimony (Richard's and Flagge's competing versions of their conversation); (2) there is a clear Board finding (Richard did not tell Flagge about the new terms); and (3) the ALJ credited both witnesses with respect to other conversations (Richard's uncontradicted testimony about what he told the 20 hoppers, and Flagge's uncontradicted testimony about what he did not

tell the other hoppers)—we will not disturb the Board's finding under the substantial evidence standard of review.

But even if the ALJ made a credibility determination that the Board overrode, the credibility choice is ultimately irrelevant. Both the ALJ and the Board agree that Flagge never communicated the new terms to the hoppers. Because Flagge never passed along Richard's message, no additional employees were put on notice of the new terms. *See Adams & Assocs.*, 2017 WL 4079063, at *8 n.6 (observing that the notice inquiry "is conducted from the employees' perspective" (citing *Fall River Dyeing & Furnishing Corp. v. NLRB*, 482 U.S. 27, 43–44 (1987); *NLRB v. Hous. Bldg. Serv., Inc.*, 936 F.2d 178, 180 n.1 (5th Cir. 1991))).

We next consider Richard's communication of new terms to about 20 hoppers (plus the subsequent informal word-of-mouth exchanges between the hoppers). These communications were insufficient to put a majority of Creative's workforce on notice of the new terms. Although the *Burns* Court and *Spruce Up* Board spoke in terms of a plan "to retain all of the employees in the unit," the Board and lower courts have subsequently recognized that the relevant inquiry is whether the successor planned to retain enough of the predecessor's employees so that the union's majority status will continue.[4]

---

[4] *See Galloway Sch. Lines*, 321 N.L.R.B. 1422, 1427 (1996) ("To summarize, the duty to bargain may not arise when initial employment terms are set because it may not be evident at that time that the union's majority status in the old work force will continue in the new one. However, in other situations, it may be apparent from the new employer's hiring plan that the union's majority status will continue, and then the new employer is required to bargain over initial terms."); *see also DuPont Dow*, 296 F.3d at 500–01 ("But where it is 'perfectly clear' that the new employer intends to retain the unionized employees of its predecessor as a *majority* of its own work force under essentially the same terms as their former employment, the new employer becomes a 'perfectly clear successor' and must bargain with the union." (emphasis added)); *Canteen Corp.*, 103 F.3d at 1361–62 ("The Court thus established that a successor would be required to bargain with the union before setting its initial terms of hiring when it was clear that it intended to hire a *majority* of the predecessor's workforce." (emphasis added)).

Such a rule is sensible, and the Board's reasoning shows why. Here, the Board reasoned that allowing a successor to communicate its new terms to a minority of its incumbent employees would invite abuse. A new employer "would be encouraged to announce changes in preexisting terms only to a select few incumbent employees, while allowing the majority of employees to be lulled by its silence into not seeking other work." *Creative*, slip op. at 5. Like the Board, we conclude that such a result would be at odds with *Burns* and *Spruce Up*.

The word-of-mouth spread of the new terms to some hoppers does not change this result. Both the ALJ and the Board found that "the record affords no way of quantifying how many of the hoppers had learned about the $11 per hour wage rate or the other terms and conditions of employment before they reported for work . . . on June 2." *Id.* Neither witness who testified that the hoppers knew of the new pay rate before June 2 said how many hoppers were privy.[5] It was reasonable for the Board to conclude that a majority of the

---

[5] The ALJ, relying on the testimony of one hopper, Kumasi Nicholas, also found that Creative notified some other hoppers about the new terms in advance of the June 2 meeting. The Board found that Nicholas's testimony did not support a finding that the hoppers were told of the new terms in advance. On direct examination, Nicholas was asked, "[W]hat happened on the very first day that [Creative] began operations[?]" Nicholas responded, "Well, they told us ahead of time—Mrs. Jackson told us ahead of time, you know, might be switching over to another little company where—you know, a pay rate, and she just let us know ahead of time, and then that's when, you know, they started off." An effort to clarify whether Nicholas learned about the pay rate before the June 2 meeting produced the response, "I'm not sure. It's been about a year. . . . I know she told me that, but I'm not sure." *Creative*, slip op. at 5 n.13.

We will not disturb the Board's conclusion. We acknowledge that when "the Board disagrees with the ALJ's findings, this court examines the findings of the Board more critically than it would have done had the Board agreed with the ALJ." *Tex. World Serv. Co., Inc. v. NLRB*, 928 F.2d 1426, 1430 (5th Cir. 1991). "But this court still sustains the Board's findings if the record taken as a whole contains substantial evidence to support those findings." *Id.* at 1431. "Provided substantial evidence exists, this court cannot reverse the Board's decision when the Board and the ALJ merely draw different inferences from established facts." *Id.* Here, the Board merely drew a different inference (that Nicholas learned of the new terms at the June 2 meeting) from facts the ALJ and Board shared. Based on the ambiguity of Nicholas's response and the uncertainty with which he delivered it, we find that substantial evidence supports the Board's finding.

incumbent hoppers were not put on notice through Richard's communication of new terms to about 20 hoppers and subsequent word of mouth.

The Board also found that, from the hoppers' perspective, the new pay rate was unsubstantiated rumor or gossip and therefore could not constitute a clear announcement of the new terms. Taylor, the hopper who testified that he learned about the new pay rate before June 2, could not identify his source of information. The Union official, who received a call from hoppers claiming they heard Creative would pay only $11 per hour, said the hoppers could not confirm where their information came from. We will not disturb the Board's reasonable conclusion that, as rumor and gossip with no clear source, the new terms were not clearly announced. Such a conclusion makes sense given that the purpose of a clear announcement is to give incumbent employees an opportunity to reshape their personal affairs. It is reasonable to conclude that an employee would not reshape his or her personal affairs (i.e., begin searching for new work) because he or she overhears uncorroborated rumors.

Turning lastly to the tax withholding forms, we conclude that the Board's decision, finding these forms insufficient to put the hoppers on notice, is supported by substantial evidence. Certainly, the tax forms conspicuously note that their purpose is to allow an employer to withhold taxes and social security. Creative argues that such a withholding would fundamentally change the hoppers' terms of employment, as (so the argument goes) it would convert them from independent contractors to employees. Creative further argues that with this information, the hoppers should have deduced that the forms signaled a change in their terms of employment.

While Creative's argument is reasonable, the Board's finding is even more so. The Board concluded that the inclusion of the tax forms was too ambiguous to constitute sufficient notice. In doing so, the Board pointed out that it was unclear whether the hoppers filled out tax forms for Berry III. Had

they previously done so, Creative's inclusion of tax forms would not clearly signal a change in employment terms. Further, the Board observed that no evidence existed that the hoppers considered themselves independent contractors rather than employees. Absent knowledge of their alleged original status as independent contractors, the hoppers would be unable to deduce that a tax withholding would change that status. Finally, a number of hoppers wrote that they were exempt from paying taxes on the forms, indicating that the tax forms did not signal to the hoppers that a change in tax collection practices was imminent. Indeed, none of the hoppers testified that they understood that Creative planned to deduct taxes from their pay before the June 2 announcement. Given both the ambiguity of the announcement and the multistep deductions required for an employee to identify the change in employment terms, we determine that the Board's conclusion that the tax forms did not put the hoppers on notice is supported by substantial evidence. *See Rosdev Hosp., Secaucus, LP & La Plaza, Secaucus, LLC*, 349 N.L.R.B. 202, 207 (2007) (ALJ op.) ("[T]o the extent an employer's pretakeover announcement contains ambiguities regarding the terms and conditions of employment offered to employees, such ambiguities will be resolved against the employer.").

The two cases Creative cites to support its argument that the inclusion of tax forms was sufficient notice—*S & F Market* and *Ridgewell's*—in fact demonstrate the reasonableness of the Board's position. Both present situations in which the notice at issue explicitly stated the new terms. No multistep deductions were required on the part of the employees. In *S & F Market*, the new employer included a cover letter with each job application that promised "significant operational changes," identified various pre-employment checks and tests to be passed, and required the applicant to affirm his or her understanding that the employment offered would be temporary and at will.

23

*S & F Mkt.*, 570 F.3d at 356. The panel concluded that "the employees *had every indication*—from S & F's job applications, interviews, and letters offering employment—that S & F intended to institute new terms of employment." *Id.* at 360 (emphasis added). Similarly, in *Ridgewell's*, the new employer announced to the union during a meeting that it would change the workers' statuses from employees to independent contractors. *Ridgewell's Inc.*, 334 N.L.R.B. 37, 37 (2001). The announcement "clearly signaled that the [new employer's] initial terms and conditions of employment would differ." *Id.*

To be clear, a new employer need not produce an itemized list of changes to employment terms. But the inclusion of tax forms in this case falls well short of the simple and direct announcements in *S & F Market* (via a cover letter with the job application) and *Ridgewell's* (during a meeting with the union).

We acknowledge that this case does not present facts indicating that Creative endeavored to create an impression that it would keep Berry III's terms. This case is therefore slightly dissimilar from *DuPont Dow* and *Elf Atochem*, two opinions the Board cites to support its decision. In *DuPont Dow*, a single sentence in a memorandum distributed to the employees stated that the new employer would set initial terms. *DuPont Dow*, 296 F.3d at 503. This single sentence was not "sufficiently clear and definite to overcome the impression carefully created by the Company that the terms and conditions would remain the same." *Id.* Similarly, in *Elf Atochem*, the new employer told the employees it would offer "comparable" terms and conditions and then reneged. *Elf Atochem N. Am., Inc.*, 339 N.L.R.B. 796, 808 (2003).

But while the case before us is distinguishable from *DuPont Dow* and *Elf Atochem*, the distinction is not dispositive. The *Spruce Up* Board did not limit the perfectly clear exception to situations where employees are actively misled. Rather, the Board warned that employees could be misled merely through "tacit inference." *Spruce Up*, 209 N.L.R.B. at 195. Indeed, even when

employees "are not affirmatively led to believe that existing terms will be continued," the expression of intent to retain the incumbents can, by itself, "engender expectations," causing employees to "forego the reshaping of personal affairs." *Int'l Ass'n of Machinists*, 595 F.2d at 674.

### b. *Necessity of a Bargaining Demand*

Creative's next argument is that it did not violate its bargaining obligation because at the time Creative unilaterally set terms, the Union had not sent a bargaining demand. It relies on *Fall River Dyeing & Furnishing Corp v. NLRB*, to argue that all successors are free to set initial terms before the union demands bargaining. Creative's duty to bargain was therefore not triggered until the Union's demand on June 6, four days after Creative announced its initial terms.

We find this argument meritless. As the Board pointed out, *Fall River*'s demand rule "developed in a very different context," namely the ordinary successor context. *Creative*, slip op. at 6. The Board concluded that nothing in the language or the reasoning of *Fall River* supports the demand rule's extension to the perfectly clear successor context. A full digression into *Fall River* and cases interpreting it shows why.

In *Fall River*, the Supreme Court addressed when an ordinary successor's obligation to bargain with an incumbent union attaches. *See Fall River*, 482 U.S. at 30. The successor in that case restarted its predecessor's operations following a seven month hiatus and gradually built its workforce. *Id.* at 32–33, 45. As a result of this gradual buildup, the percentage of the successor's workforce composed of its predecessor's employees fluctuated. *See id.* at 47. Due to this ongoing fluctuation, the Court was tasked with setting the proper moment to check to see if the majority of the successor's workforce was composed of its predecessor's employees. *See id.* To set this moment, the Court adopted the "substantial and representative complement" rule. *Id.* A

successor's bargaining obligation is triggered when it hires a "substantial and representative complement" of its workforce, a majority of which had previously been employed by its predecessor. *Id.* But a bargaining obligation only triggers at this moment if the union has made a bargaining demand. *Id.* at 52. The Court reasoned that the combination of the "substantial and representative complement" rule as well as the demand rule would avoid placing "an unreasonable burden" on the employer to determine when its bargaining obligation attaches. *See id.* at 50. "Once the employer has concluded that it has reached the appropriate complement, then, in order to determine whether its duty to bargain will be triggered, it has only to see whether the union already has made a demand for bargaining." *Id.* at 52–53.

Importantly, however, the *Fall River* Court suggested that in some situations the composition of the employer's workforce alone may trigger a duty to bargain. The *Fall River* Court observed that the "'triggering' fact for the bargaining obligation" in *Burns* was the "composition of the successor's work force." *Id.* at 46. The Court noted that in *Burns* the predecessor's "contract expired on June 30 and [the successor] began its services with a majority of [the predecessor's] guards on July 1." *Id.* at 47; *see Burns*, 406 U.S. at 275. There was no "start-up period by the new employer while it gradually buil[t] its operations and hire[d] employees." *Fall River*, 482 U.S. at 47.

No case Creative cites has extended the demand requirement that *Fall River* established for ordinary successors to perfectly clear successors.[6]

---

[6] *Cadillac Asphalt*, the one case Creative cites as applying the demand rule in the perfectly-clear-successor context, actually supports the contention that a perfectly clear successor's obligation to bargain over initial terms may arise before a union demand. In *Cadillac Asphalt*, the union's demand came after Cadillac changed its terms and conditions. *See Cadillac Asphalt Paving Co.*, 349 N.L.R.B. 6, 7–8 (2007). Cadillac stopped contributing to its employee's union benefit fund on July 16. *Id.* at 7. The union's response came two days later, on July 18. *Id.* Nevertheless, the Board held that Cadillac was a perfectly clear

Tellingly, not all courts even extend the demand requirement to all ordinary successor cases. The Second Circuit in *Banknote Corp.*, limited the demand rule to factual circumstances analogous to *Fall River*—i.e., where there is a "gradual or staggered hiring" or "a significant hiatus in operations." *Banknote Corp. of Am. v. NLRB*, 84 F.3d 637, 646 (2d Cir. 1996). In those cases, a bargaining demand has an important function as there "may be considerable doubt as to whether a union that enjoyed the support of a majority of a predecessor's bargaining unit continues to do so under the successor's operation." *Id.* at 645. But when the successor engages in "a rapid transition period with the immediate hiring of a full employee complement," the rationale for the demand rule dissipates. *Id.* at 646. In those cases, the successor will be able to "easily discern its obligation to presume that the [union] continued to enjoy majority status." *Id.* at 645–46.

While this court has indicated that a union bargaining demand is required to trigger a bargaining obligation in the ordinary successor context, *see Hous. Bldg. Serv.*, 936 F.2d at 180, we find *Banknote*'s reasoning persuasive for the perfectly clear successor context. Self-evident as it may be, the perfectly clear exception only applies when it is "perfectly clear" that the union's majority status will survive the transition from predecessor to successor. *See Burns*, 406 U.S. at 294–95. Accordingly, sending a bargaining demand to a perfectly clear successor would be superfluous because the new employer would be able to "easily discern" from the outset that the union will presumptively retain its majority status during the transition. *See Banknote Corp.*, 84 F.3d at 645–46. We therefore decline to require a union bargaining demand to trigger a perfectly clear successor's duty not to unilaterally set

---

successor and ordered it to make employees whole for its failure to make benefit fund payments starting on July 16. *Id.* at 13.

initial terms of employment. In perfectly clear successor cases, the "composition of the successor's work force" alone is the "'triggering' fact for the bargaining obligation." *See Fall River*, 482 U.S. at 46.

### c. *Validity of the Complaint*

Finally, Creative argues the Board's complaint was void because it was issued on behalf of Acting General Counsel Lafe Solomon, who at the time was serving in violation of the Federal Vacancies Reform Act ("FVRA"). The Board contends we lack jurisdiction to hear this argument because Creative was untimely in making it. Even if we have jurisdiction, the Board contends that the later General Counsel ratified the complaint, effectively curing any defect.

"[T]he FVRA prevents a person who has been nominated for a vacant PAS [Presidential nomination and Senate confirmation] office from performing the duties of that office in an acting capacity." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938 (2017). Solomon's nomination was pending in the Senate from January 2011 to January 2013. *Id.* at 937. During that time, Solomon was serving as Acting General Counsel. *See id.* The FVRA prohibited him from doing so. *Id.* at 944. The complaint in this case was filed in March 2012 while Solomon was serving as Acting General Counsel in violation of the FVRA. Creative thus argues that the complaint was void and "may not be ratified." *See SW Gen., Inc. v. NLRB*, 796 F.3d 67, 71, 78 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017).[7]

The Board responds by arguing the NLRA precludes our consideration of this issue. It relies on Section 10(e), which provides: "No objection that has

---

[7] Creative's argument relies on the general rule that actions taken in violation of the FVRA are void *ab initio*. The FVRA, however, expressly exempts "the General Counsel of the National Labor Relations Board" from this rule. 5 U.S.C. § 3348(e)(1). The D.C. Circuit has left open whether the actions of an improperly serving Acting General Counsel are voidable or instead "wholly insulate[d] . . . even in the event of an FVRA violation." *SW Gen.*, 796 F.3d at 79. We express no view on that question.

not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Creative did not challenge Solomon's authority when it filed its exceptions to the ALJ's decision in February 2013. Creative did not object until April 2016, and the Board concluded the objection was untimely. *See* 29 C.F.R. § 102.2(d)(1); *see also id.* § 102.46(f). Creative does not now argue that its exceptions were timely or that it has shown extraordinary circumstances. *See Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 550–52 (5th Cir. 2013). Such arguments are forfeited. *See SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 784 (5th Cir. 2017). We have held untimely objections to be waived under Section 10(e). *See Hallmark Phx. 3, L.L.C. v. NLRB*, 820 F.3d 696, 712–13 (5th Cir. 2016). Because Creative did not timely object to Solomon's authority to file the complaint, our review of any such argument is barred. *See* 29 U.S.C. § 160(e); *Hallmark*, 820 F.3d at 713.

## III.   CONCLUSION

For the foregoing reasons, we deny Creative's petition and grant enforcement of the Board's order.